Argued and submitted November 19, 1997, affirmed June 10, 1998

Suzanne S. WIDING
and Lorinda L. Michaelsen,
*Appellants,*

*v.*

SCHWABE, WILLIAMSON & WYATT
and William J. Welch,
*Respondents,*

*and*

ESTATE OF GLENN A. WIDING,
Deceased,
William J. Welch, Karin Widing and Norris Heinbuch,
Co-Personal Representatives;
and Glenn A. Widing Family Trust,
William J. Welch, Karin Widing and Norris Heinbuch,
Co-Trustees,
*Defendants.*

(A9206-03651; CA A81704)

961 P2d 889

Jeremy L. Fellows argued the cause for appellants. With him on the briefs was Ambrose & Associates, P.C.

Susan E. Watts argued the cause for respondent Schwabe, Williamson & Wyatt. With her on the brief was Kennedy King & Zimmer.

Katherine A. McDowell argued the cause for respondent William J. Welch. With her on the brief were Clarence M. Belnavis and Stoel Rives LLP.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

DE MUNIZ, P. J.

**DE MUNIZ, P. J.**

Plaintiffs brought this action, asserting claims, *inter alia*, for negligent misrepresentation and fraud against defendant Welch (Welch), the copersonal representative of their deceased father's estate, and for professional negligence against defendant Schwabe, Williamson & Wyatt (Schwabe), the estate's attorneys.[1] The trial court granted defendants' motions for summary judgment on the ground that the various claims were barred by the applicable statute of limitations. Plaintiffs appeal, contending, among other things, that the trial court erred because the running of the limitation period was tolled under the "discovery rule." We affirm.

Glenn A. Widing, plaintiffs' father, died in August 1986. In addition to being beneficiaries under his will, plaintiffs were the beneficiaries of insurance policies on his life. A short time before he died, Widing wrote letters to plaintiffs asking them to loan his estate the insurance proceeds that they would receive on his death. He anticipated, and later events bore out, that the estate would have "liquidity" problems. The estate's principal asset was the stock of G.K., Inc., a corporation that had been wholly owned by Widing. The corporation's principal asset, in turn, was an installment note representing the amount that an entity called "ABF" owed for real property (the Airport Way property) that it had purchased from Widing and the corporation in 1984. The note was secured by a trust deed on the undeveloped property itself. In the autumn of 1986, ABF defaulted.

Consistent with their father's request, plaintiffs had loaned the estate approximately $800,000 of the $2 million total of their insurance benefits before the ABF default occurred. Thereafter, as stated in plaintiffs' opening brief, they "were advised by defendant Welch to retain independent counsel to assist them in negotiating the terms of their loan to the Estate[.]"[2] Plaintiffs hired a Portland attorney,

---

[1] A related controversy was before us in *Widing v. Estate of Glenn A. Widing*, 149 Or App 451, 944 P2d 969 (1997).

[2] Under our standard of review of the trial court's rulings on defendants' motions for summary judgment, we view the facts in the light most favorable to plaintiffs. In so doing, we will sometimes quote from the statement of facts in plaintiffs' brief. (In our quotations, we omit plaintiffs' footnotes and citations to the record.) Defendants do not agree with all of the facts plaintiffs state, or with the

Steven Cyr. His first services on their behalf concerned the terms of the entire loan and the conditions on which they would transmit the $1.2 million balance of the proceeds to the estate.

We quote plaintiffs' version of what then ensued from the statement of facts in their brief:

"Mr. Cyr was concerned about the security for plaintiffs' loans. When he was unable to negotiate a security interest in all of the assets of the Estate, he sought other concessions from the Estate to make default less likely. Ultimately, it was agreed that the Estate would pledge its stock in G.K., Inc., as the sole security for plaintiffs' loans.

"During negotiations, Mr. Cyr spoke with one of the Estate's attorneys, who agreed that, if the loans were made, no estate funds would be distributed to any party without plaintiffs' consent. That agreement was confirmed in writing by Mr. Cyr in a letter to the Estate's attorney on October 15, 1986, copies of which were sent to and reviewed by plaintiffs.

"On November 5, 1986, defendant Welch and one or more of the Estate's attorneys met with plaintiffs, without Mr. Cyr's knowledge, and obtained plaintiffs' signatures on loan documents which Mr. Cyr had never been given an opportunity to review. Plaintiffs placed a great deal of trust in defendant Welch, who told plaintiffs that they had a legal obligation to loan the rest of the insurance proceeds to the Estate. Plaintiffs believed defendant Welch, and shortly thereafter transferred the remaining $1,239,600.00 in insurance proceeds to the Estate.

"When Mr. Cyr found out about what had occurred at the November 5th meeting, he told the Estate's attorneys that they were not to treat the signed loan documents as legally binding on plaintiffs. Subsequently, when Mr. Cyr received draft loan documents to review, he discovered that they did not reflect all of the terms to which the Estate's attorneys had previously agreed. He corrected the draft, in part, by inserting ¶3.7, which provided that:

---

manner in which plaintiffs state them. We note, however, that viewing the facts as favorably as possible to plaintiffs is part of a standard of review and signifies no credibility determinations on our part.

Welch is not an attorney. The term "independent counsel" in the quoted language refers to an attorney other than those representing the estate.

" 'No distributions shall be made from the Estate or any portion thereof, nor shall payment of any administration expenses, attorney fee or other charge be made, so long as this debt is outstanding without the written consent of the pledgee, which consent will not be unreasonably withheld.'[3]

"Mr. Cyr advised plaintiffs on December 12, 1986, that the draft documents he had been sent failed to include all of the agreed-upon terms. Mr. Cyr did not tell plaintiffs that the Estate had reneged on its agreement to include the above-quoted language in the final loan documents, since no representative of the Estate had ever told Mr. Cyr that the Estate intended to withdraw from that part of the agreement.

"On December 23, 1986, Mr. Cyr attended a meeting with estate representatives to discuss the draft loan documents. He gave the Estate's attorneys a copy of the draft he had received which he had edited to include the language in ¶3.7 quoted above. No representative of the Estate told Mr. Cyr, either before or during the meeting, that the Estate wished to renege on its original agreement by deleting ¶3.7. On January 6, 1987, Mr. Cyr's office received a letter from the Estate's attorneys enclosing loan documents with markings purportedly highlighting all of the changes which had been agreed to at the December 23rd meeting. The cover letter, which directed Mr. Cyr's attention to the language in ¶8.3, made no mention of the fact that the language in ¶3.7 had been deleted from the agreement.

"On January 8, 1987, defendant Welch told plaintiffs that, since the documents were in final form, they should terminate Mr. Cyr's services and come in to sign the documents. Plaintiffs did not know, when they signed the final loan documents on that date, that the final documents did not contain the language in ¶3.7 that Mr. Cyr had insisted upon. If plaintiffs had known that the provision had been deleted, they would not have signed the loan documents or loaned their money to the Estate.

"Plaintiffs believed that the loan documents contained such language, because defendant Welch reassured them, shortly before they signed the documents, that the form of

---

[3] The legality of that provision, and of the corresponding representation that plaintiffs assert Welch made, is not an issue in this case.

the final documents satisfied all of Mr. Cyr's concerns and that no distributions would be made to other beneficiaries until their notes were paid. At that time, plaintiffs were also unaware of the fact that, shortly after they had transferred the initial $805,727.13 in insurance proceeds to the Estate in late September of 1986, the Estate had transferred $730,000 to open an account and fund a trust for one of the co-personal representatives of the Estate, in which plaintiffs had no beneficial interest.

"At defendant Welch's suggestion, plaintiff Suzanne Widing called Mr. Cyr and told him that the loan documents had been finalized to their satisfaction, and that his services would no longer be required. Mr. Cyr did not tell Ms. Widing that ¶3.7 had been deleted from the draft that his office had received, because he was unaware of that fact. Plaintiffs then signed the loan documents at issue in this case."[4]

Plaintiffs then loaned the estate the remainder of the $2,000,000. It is important to emphasize that, notwithstanding the absence of the provision from the documents, Welch himself reassured plaintiffs when they consummated the transaction that "no distributions would be made to other beneficiaries until their notes were paid."

Plaintiffs again retained Cyr in August 1987. At that time, there were two matters of concern. The first was a proposal to develop the Airport Way property, which had become the estate's principal asset. The second was a proposal to transfer the shares of the corporation to an employee stock ownership plan (ESOP) for the purpose of reducing estate taxes. Cyr opposed both proposals, at least unless some alternative to the corporate stock could be found to secure the loan. According to Cyr's affidavit in the summary judgment proceeding, he was aware that the ESOP transfer would result in the loss of plaintiffs' security interest in the G.K. stock. In February 1988, plaintiffs signed consents to the ESOP transfer, at the behest of Welch. Their brief states, in that connection:

---

[4] Although the fact is not critical to our disposition, it is our understanding that the January 6 mailing from the estate's attorneys to Cyr included the loan instruments themselves, as well as the cover letter.

> "Because plaintiffs had never discussed the ESOP transaction with Mr. Cyr, they asked defendant Welch whether they needed to have Mr. Cyr represent them in the transaction. He told plaintiffs that signing the consent forms would not affect their rights as creditors."

Consequently, Welch said that Cyr's advice was unnecessary, and plaintiffs signed the forms.

Between the time of the ESOP transfer and March 1991, a number of other events occurred, most of which we need not describe in detail, except to note that, by plaintiffs' understanding of the facts, they resulted in detriment to their interests as creditors and beneficiaries of the estate. Of those events, only one is significant to our disposition: In December 1988, the estate made distributions to several beneficiaries under Widing's will and, as expressed in their brief, plaintiffs became aware "before June 2, 1990" that the distributions had been made. They brought this action on June 2, 1992. Approximately five months before the action was initiated, the estate had stopped making its payments on the loan.

In March 1991, plaintiffs again sought Cyr's assistance.[5] They contend that, although all of the conduct giving rise to their negligence claims against Welch and Schwabe and their fraud claim against Welch occurred more than two years before they brought the action, the two-year limitation period of ORS 12.110(1) did not begin to run, at the earliest, until around the time that Cyr returned to the scene in 1991. They argue that, before then, they did not know and could not reasonably have known that defendants' conduct was tortious or that it had resulted in harm to them; therefore, under the "discovery rule," the statute started running only after they had the requisite information, which was less than two years before they initiated the action.

■    The discovery rule, as it applies to plaintiffs' negligence claim against Welch, was described by the Supreme Court in *Gaston v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994):

---

[5] It is unclear to us whether Cyr played *any* role in the relevant events during the intervening period.

"[T]he statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware of a substantial possibility that each of the three elements [of legally cognizable harm] (harm, causation, and tortious conduct) exists.

"We emphasize that this is an objective test. In most cases, the inquiry will concern what a plaintiff should have known in the exercise of reasonable care. In such cases, the relevant inquiry is how a reasonable person of ordinary prudence would have acted in the same or similar situation. *See Woolston v. Wells*, 297 Or 548, 557, 687 P2d 144 (1984) (reasonable care means what a reasonable person of ordinary prudence would do in the same or similar circumstances). Relevant to this analysis will be a plaintiff's failure to make a further inquiry if a reasonable person would have done so. The discovery rule does not protect those who sleep on their rights, but only those who, in exercising the diligence expected of a reasonable person, are unaware that they have suffered legally cognizable harm."[6]

The discovery rule, as it applies to the fraud claim, is essentially similar, except that the actual or inquiry knowledge that a plaintiff must have in order to start the running of the statute has sometimes been described as including the fact of the fraud itself. *See Mathies v. Hoeck*, 284 Or 539, 542-43, 588 P2d 1 (1978). Under the facts of this case, that is not a material difference.

A final aspect of the discovery rule that is significant in this case is that it does not contemplate that a plaintiff's actual or inquiry knowledge must extend to all of the particulars of his or her ultimate injury. Rather, the rule delays the running of the limitation period only until the plaintiff knows or should know that *some* harm has been incurred and that *a* claim exists. The statute is not delayed until the plaintiff is or

---

[6] In *Gaston v. Parsons*, 318 Or 247, 864 P2d 1319 (1994), the court was specifically concerned with ORS 12.110(4). However, the court expressly equated the components of the discovery rule under that statute to those under ORS 12.110(1) and/or to its own case law interpreting ORS 12.110(1) that the legislature "codified" in enacting ORS 12.110(4). *Id.* at 253-56.

Unless the facts can support only one conclusion, as we conclude is the situation here, the question of whether and when a plaintiff has the necessary information to have discovered the claim is one for the trier of fact.

should be aware of the full extent of his or her damage or of all the details relevant to the claim. *See Duyck v. Tualatin Valley Irrigation Dist.*, 304 Or 151, 163-65, 742 P2d 1175 (1987), and cases there cited.

■       In both their negligent misrepresentation and fraud claims against Welch, plaintiffs alleged in their fifth amended complaint—the operative one at the time of the summary judgment proceeding—that he made the following false representations:

"A.    That, if plaintiffs loaned to the Estate the funds referenced in Exhibits A through B, no other beneficiaries would receive a distribution until plaintiffs' Notes were paid.

"B.    That plaintiffs were getting a security interest in the Property in return for the loan referenced in Exhibits A and B.

"C.    That the sale of the G.K., Inc. stock in connection with creation of the ESOP would not adversely [a]ffect plaintiffs' security interests."

Among the items that plaintiffs specifically included in the damages that they sought to recover were the distributions to the other beneficiaries. As noted, plaintiffs acknowledge that they actually were aware of those distributions more than two years before they brought this action. Assuming plaintiffs' premise that Welch represented that there would be no such distributions and that the representation was false when made, plaintiffs necessarily gained the knowledge necessary to make the fact of the falsity discoverable simultaneously with their discovery of the distributions. Hence, the tortious or fraudulent conduct and its causal link to the distributions were discoverable more than two years before the action was brought. However, plaintiffs contend—at least inferentially—that the distributions and various other earlier events about which they complain did not constitute "harm" to them, because they sustained no "pecuniary loss" until the estate defaulted on the loan payments. That contention is difficult to square with the fact that plaintiffs specifically sought damages for the distributions. More fundamentally, however, the contention begs the question. The misrepresentation, at the time it was made, was an

*inducement* for the loan (or at least the larger part of it). The fact that plaintiffs chose to await the estate's *default on* the loan before bringing their action does not mean that they did not have *a* claim that accrued on their discovery of the breach of the representation that they allege Welch made. The making of the loan itself was a legally cognizable harm, at least in the absence of the security protections that Welch allegedly represented would be in place.

Accordingly, plaintiffs had sufficient knowledge that they had *a* claim to start the running of the limitation period more than two years before they brought this action. Although their specific allegations against Schwabe differ from those against Welch, the same essential reasoning leads us to the same conclusion with respect to the professional negligence claim.[7]

We have considered plaintiffs' other assignments and reject them without discussion.

Affirmed.

---

[7] Given the grounds for our holding, we need not reach and expressly do not decide Schwabe's alternative arguments that plaintiffs *cannot* state a professional negligence claim against it on these facts.