Argued and submitted October 7, 1998, reversed and remanded March 22, respondent's petition for reconsideration filed April 3 and appellant's response filed April 14 granted by opinion June 28, 2000

See 167 Or App 322, 1 P3d 1060 (2000)

# NIKE, INC.,
an Oregon corporation,
*Appellant,*

*v.*

# NORTHWESTERN PACIFIC INDEMNITY COMPANY,
an Oregon corporation,
*Respondent.*

## (C96-0209CV; CA A97847)

999 P2d 1197

Thomas W. Sondag argued the cause for appellant. With him on the briefs was Lane Powell Spears Lubersky LLP.

G. Kevin Kiely argued the cause for respondent. With him on the brief were Ridgway K. Foley, Jr., Cable Huston Benedict & Haagensen LLP and Greene & Markley, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

## LINDER, J.

Plaintiff Nike, Inc. (Nike) initiated this action against defendant Northwestern Pacific Indemnity Company (Northwestern) for breach of an insurance contract covering losses due to employee theft. Northwestern sought summary judgment on the ground that Nike failed to initiate the action within two years of its discovery of the loss, as required by the limitation period specified in the policy. The trial court granted defendant's motion for summary judgment, and Nike appeals. Viewing the facts and all reasonable inferences in the light most favorable to Nike, we conclude that a fact-finder reasonably could resolve the issue of when Nike discovered the loss in favor of either party.[1] Consequently, Northwestern is not entitled to judgment as a matter of law. We reverse and remand.

Although the parties disagree as to the inferences to be drawn from them, the basic facts are not in dispute. Nike Taiwan, a wholly owned subsidiary of Nike, is a wholesale and retail distributor of Nike products in Taipei. It is insured under the Northwestern policy at issue here. Nike employed Su Chi-Chiang (Su) as its wholesale customer accounts manager in Taiwan. In that capacity, Su managed all of Nike's Taiwan sales accounts and, in particular, negotiated the distribution agreements with customers and oversaw the terms of the sales. Nike customers included Life Enterprises International (denominated "LIFE" by the parties). Su happened to be a personal friend of the Huangs, the two brothers who were the principals of LIFE.

The financial loss that led to Nike's claim under its policy, and later to this litigation, occurred as a result of Su's dealings with LIFE and the Huangs. In negotiating the distribution agreement between Nike and LIFE, Su should have required LIFE to provide collateral of sufficient value, as well as guarantors with sufficient assets, to protect Nike in the event that LIFE did not meet its obligations under the contract. Su did not. Instead, he accepted as collateral property

---

[1] *See* ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997).

that already was mortgaged, and he approved as guarantors various relatives of the Huangs who had no assets.

In addition, Su engaged in practices that violated Nike's stated company policies in his day-to-day dealings with LIFE. Specifically, in payment for products sold to LIFE, Su accepted checks that were postdated by more days than company policy allowed.[2] Su also granted discounts to LIFE on its orders, even when the orders were not placed six months in advance, as Nike discount policy required, thus reducing Nike's income. Finally, Su was selling products to LIFE in volumes suggesting that LIFE, rather than selling in the Taiwan market, was instead exporting the goods to Japan and competing with Nike's own sales there.[3]

Although Su's actions in those regards violated Nike's stated policies, they were not necessarily at odds with Taiwan business expectations generally or with what Nike tolerated in actual practice. Jeff Bolton, the general manager of Nike's Taiwan subsidiary, acknowledged that his sales staff commonly gave customers discounts even when the orders had not been placed more than six months in advance. It was also common practice in Taiwan to accept checks postdated by more than Nike's policy supposedly allowed. Bolton knew that Su permitted many customers, not just LIFE, to do so for at least up to 60 days, especially long-term customers who were slow to accept Nike's more stringent policy. Bolton suspected LIFE was exporting products to Japan rather than retailing locally. He had the same suspicions about other companies as well. An effort to investigate LIFE's retail

---

[2] The record establishes that it is a common commercial practice in Taiwan to pay for goods with postdated checks. Nike allowed that practice, but its policy limited the acceptable length of the postdating. Nike's policy is not consistently described in the record, but it permitted postdating by at least 30 to 45 days. Su allegedly accepted checks from LIFE that were frequently postdated by 60 days and, in some instances, as much as 90 days.

[3] That practice is termed "parallel exporting," and it is a particular problem in certain markets, such as Japan. Nike cannot contract to prohibit its Taiwan customers from exporting products to another country because Taiwan fair trade practices laws make it unlawful to do so. Therefore, Nike protects its interests by declining to do business with customers that it knows are engaged in parallel exporting and by relying on its sales staff to make sure that the amount of products ordered by a customer does not exceed what that customer reasonably can be expected to sell in the immediate retail market.

activities produced evidence, as of the summer of 1991, only that LIFE had exported a small amount of Nike products to Singapore. Because Su insisted to Bolton that the Singapore export was an isolated instance and because there was no documentation or other strong evidence of other exporting activities by LIFE, Nike decided not to reduce the volume it was selling to LIFE. Bolton suspected Su might be getting "kickbacks" from LIFE, but he was not concerned because "gifts" of that kind are "[j]ust the nature of the business" in Taiwan. Bolton knew that his sales people generally got some kickbacks, and he at that point did not suspect that Su was getting kickbacks that were out of the ordinary.

Notwithstanding Su's violations of Nike's policy in his handling of LIFE's account, LIFE and the Huangs had been, in Bolton's view, "extremely good customers." LIFE always had honored its postdated checks and paid its debts to Nike. That changed in mid to late 1991, however. In June, LIFE's debts to Nike suddenly began to escalate rapidly, substantially increasing Nike's exposure if LIFE defaulted. Because of Nike's accounting procedures, some of which are required by Taiwan law, the postdated checks served to "mask" the escalating debt, and Nike management remained unaware of it. Moreover, even as the debt escalated, LIFE continued to honor its postdated checks as they came due. Meanwhile, in an unusually short time, LIFE accumulated almost $3 million of new debt.

In November 1991, a number of postdated checks from LIFE came due, and LIFE unexpectedly refused to honor them. Bolton immediately met with a representative of LIFE, who just as immediately confronted Bolton with demands. In exchange for honoring the checks, LIFE insisted that it be permitted to pay its debt without interest over an extended time period. Also, LIFE was willing to repay only if Nike agreed to provide it with products in advance of the release dates authorized by Nike and at unauthorized discounts. LIFE's demands led Bolton to suspect that LIFE intentionally had increased its debt in order to get Nike "over a barrel" so that LIFE could gain leverage in future dealings, delay repayment, and still ultimately default on its debt. When Nike refused LIFE's conditions for repayment, LIFE dishonored the checks. Efforts to engage LIFE in further

negotiations over the next few weeks were fruitless. Nike ultimately discovered that LIFE had no assets that Nike could access, that LIFE's collateral was worthless, and that LIFE's guarantors also had no assets. Nike sustained a loss of approximately $2.34 million.

When he first learned that LIFE might dishonor its checks, Bolton tried to determine from Su what he knew about LIFE's finances and motivations. Su's explanations did not make sense to Bolton, causing him to believe that Su either "had no clue or was unwilling to reveal whatever he knew about LIFE's real financial condition." After LIFE's eventual default, at which point Bolton suspected LIFE of deliberately accumulating the debt to force Nike to deal even more favorably with it, Bolton met with Su and confronted him directly about his role in the matter. Su was completely unresponsive. He merely looked at Bolton "blankly" and would not answer any questions. Because Su would not respond, Bolton fired him.

After LIFE defaulted, Nike hired a Taiwan firm of private investigators to, among other things, trace LIFE's and Su's assets and attempt to determine whether there was a "beneficial relationship" between Su and LIFE's principals, the Huangs. The investigation confirmed a personal friendship between Su and the Huangs, but nothing more. The investigation extensively documented Su's acceptance of excessively postdated checks from LIFE and his unauthorized price discounts. However, the investigators found it impossible to trace Su's assets and transactions or to establish whether Su had gotten more than the customary business kickbacks from LIFE.

In March 1992, with the assistance of local attorneys, Nike filed a complaint with the Taipei prosecutor accusing Su of conspiring with the Huang brothers to commit the offense of "breach of fiduciary duty." Nike's petition alleged the ways in which Su had violated company policy and asserted that it was "evident" that Su worked in collusion with the Huangs "with the intent to cause injury to [Nike] and gain illegal profit." About that same time, Nike also pursued a claim of loss for employee theft under its insurance policy with Northwestern. Nike filed a notice of potential loss

in April 1992 and submitted its proof of loss in December 1992.[4] In response, Northwestern conducted an investigation, which included an extensive interview with Bolton in June 1993 about the circumstances of the loss and his own conclusions about it. In August 1993, Northwestern determined that, although Su had violated company policy, there was no evidence that Su intended to or did steal from Nike in any way. Northwestern therefore denied the claim. Nike agreed with Northwestern's assessment of the available information and, for the time, ceased pursuing its claim of loss.

Several months later, in February 1994, the Taipei public prosecutor indicted Su and the principals of LIFE for breach of fiduciary duty, a criminal offense under Taiwanese law.[5] The indictment accused Su of violating the company's policies as described in Nike's complaint. The prosecutor relied in part on the documentary evidence that Nike had compiled through its investigation, which was the same documentation that Nike had given to Northwestern as proof of its loss. The indictment also recited that the prosecutor found a basis to charge Su because, "[i]n the course of court examination," Su had directly denied the activities that Nike had documented and had insisted that the responsibility for accepting any excessively postdated checks and for not obtaining adequate collateral was Nike's, not his. Based on Su's apparently false statements, the prosecutor determined that Su's "criminal acts can be concluded," which led to a formal indictment against Su.[6]

In September 1994, Nike contacted Northwestern with the additional information that Su had been indicted,

---

[1] Under the policy, the proof of loss was due four months after the notice of loss. The parties agreed to a four-month extension of time, however, which resulted in the proof of loss submission in December.

[5] The prosecutor charged Su under Article 342 of the Taiwanese Criminal Code, which, as translated into English in the indictment, provides:

"A person who manages the affairs of another with intent to procure an illegal benefit for himself or for a third person or to harm the interests of his principal and who acts contrary to his duties and thereby causes loss to the property or other interest of such principal shall be punished with imprisonment for not more than five years or detention; in lieu thereof, or in addition thereto, a fine of not more than 1,000 yuan may be imposed."

[6] Su later was tried and convicted.

which Nike believed provided the proof necessary to support its claim that Su had committed theft. In October 1994, Northwestern denied the claim again, this time on the ground that it was untimely. Nike filed this breach of contract action on June 15, 1995.

By way of affirmative defense, and later in its motion for summary judgment, Northwestern asserted that Nike's action was untimely under a provision of the policy setting deadlines for notifying the insurer of the loss, for submitting proof of loss, and for filing suit. Specifically, that provision states:

> "Upon knowledge or discovery by a proprietor, partner or officer of any Insured of loss or of an occurrence which may become a loss, written notice shall be given the Company at the earliest practicable moment, and in no event later than sixty days after such discovery. Within four months after such discovery the Insured shall furnish to the Company affirmative proof of loss with full particulars. *Legal proceedings for recovery of any loss hereunder shall not be brought after the expiration of two years from the discovery of such loss*, except [in certain circumstances that are not applicable here]."

(Emphasis added.)

■ As a preliminary matter, we note that the parties agree that, although the trigger for the notice-of-loss provision is a "discovery * * * of loss or of an occurrence which may become a loss," the trigger for the limitation-of-actions provision is "discovery of such loss." The parties therefore agree that Nike had two years from the discovery of the "loss," rather than from the discovery of "an occurrence which may become a loss," to bring its action.[7] The parties sharply disagree, however, about when Nike discovered its loss.

Although not conceding that Su's acts ultimately qualify as "theft" within the policy, Northwestern accepts that proposition for purposes of the summary judgment motion. Northwestern asserts, however, that Nike knew the

---

[7] As pointed out in *In re Prime Commercial Corp.*, 187 BR 785, 801 (Bankr ND Ga 1995), the words, "occurrence which may become a loss," refer to knowledge of some event or events that *may* give rise to coverage, but that fall short of actual knowledge of circumstances sufficient to know that the loss is a covered one.

facts and appreciated their significance when it filed the criminal complaint in March 1992 or, at most, no later than December 1992, when it filed the proof of loss. Both dates fall outside of the policy's two-year limitation period for bringing this action. Nike, in response, asserts that a factfinder could conclude that Nike's investigation gave it only a basis to suspect Su's involvement and that it was not until the prosecutor indicted Su that Nike acquired sufficient information to charge it with knowledge of Su's intentional role in LIFE's scheme. If Nike is correct, the action is timely because the indictment did not issue until February 1994.[8]

In determining whether the trial court erred in granting summary judgment to Northwestern, we must interpret and apply the policy provision that prohibits Nike from filing suit more than two years after its "discovery" of its loss. The policy does not define the term "discovery." Neither party argues that the language is ambiguous, however. Nor do the parties take significantly different positions on the level of knowledge or awareness that begins the limitation period under the policy. Nevertheless, neither the parties nor we have found any Oregon cases directly on point. We therefore begin by briefly examining what "discovery of the loss" entails, considering the term's plain meaning, cases from other jurisdictions, and other legal authorities in the insurance arena. *See generally St. Paul Fire v. McCormick & Baxter Creosoting*, 324 Or 184, 201, 923 P2d 1200 (1996) (considering dictionary definition of term in insurance policy); *Olsen v. Federal Kemper Life Assurance Co.*, 299 Or 169, 173, 700 P2d 231 (1985) (citing treatises); *Richardson v. Guardian Life Ins. Co.*, 161 Or App 615, 621, 984 P2d 917, *rev den* 329 Or 553 (1999) (consulting cases from other jurisdictions).

Insurance clauses triggering limitation periods by reference to the "discovery" of an insured loss are commonplace. *See generally F.D.I.C. v. Hartford Acc. and Indem. Co.,*

---

[8] Nike also contends that Northwestern should be equitably estopped from asserting that this case was filed too late and that the principle of "equitable tolling" should exclude from the two-year limitation period the time between when Nike first gave notice of its loss in April 1992 and when Northwestern denied the claim in August 1993. Because we hold that the trial court erred in granting summary judgment based on Northwestern's position that this action was not timely filed, we do not reach Nike's estoppel or equitable tolling contentions.

97 F3d 1148, 1149-50 (8th Cir 1996). Although the purpose of the limitation period sometimes varies—that is, it may relate to giving notice of a loss to the insurer, or it may, as here, describe when legal proceedings must be brought—the phrase "discovery of the loss" has acquired a settled meaning. One of the earliest, and still most frequently quoted, cases on point is *American Surety Company v. Pauly*, 170 US 133, 18 S Ct 552, 42 L Ed 977 (1898). There, in the context of an insurance policy that required the insured to notify the insurance company of a claim upon "discovery of the loss," the United States Supreme Court approved the following jury instruction:

> "It is not sufficient to defeat the plaintiff's right of action upon the policy that it be shown that the plaintiff may have had suspicions of dishonest conduct[.] * * * He may have had suspicions of irregularities; he may have had suspicions of fraud, but he was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act[.]"

*Id*. at 145.

The Supreme Court's statement in *American Surety* reflects the ordinary understanding of the term "discovery," which connotes "gaining knowledge" or "ascertaining the existence of something previously unknown or unrecognized." *Webster's Third New Int'l Dictionary*, 647 (unabridged ed 1993). Courts generally have followed *American Surety*, and its statement has become the "well-established rule." *See Federal Deposit Ins. Corp. v. Aetna Casualty & Surety Co.*, 426 F2d 729, 739 (5th Cir 1970) (citing authorities relying on *American Surety*). The following principles typically apply in determining whether there has been "discovery of the loss." First, and logically, the loss that is "discovered" must be a loss of a type that falls within a policy's coverage. *See, e.g., First Sec. Bank v. New Hampshire Ins.*, 232 Neb 493, 441 NW2d 188, 192 (1989); *First Dakota Nat. v. St. Paul Fire & Marine Ins.*, 2 F3d 801, 806-08 (8th Cir 1993). Second, although knowledge of all the details of the loss is not necessary, *see First Sec. Bank*, 441 NW2d at 192, the insured must be aware of "sufficient facts" to lead a reasonable person to believe that the circumstances of the loss bring it within the policy's coverage, *Perkins v. Clinton State Bank*, 593 F2d 327,

334 (8th Cir 1979). Third, the standard is an objective one and turns on what a reasonable person would or should conclude from the available information: "Discovery takes place when the insured gains sufficient knowledge, greater than mere suspicion, which would justify a reasonable and prudent person to believe that an act of dishonesty [or, here, theft] and loss within policy coverage had taken place." Lee R. Russ & Thomas F. Segalla, 11 *Couch on Insurance* 3D § 160:97, at 160-86 (1998) (footnote omitted). We agree with and adopt those statements of the applicable standard.[9]

■ We turn, then, to the record in this case. The policy here insured Nike against losses from theft by an employee "acting alone or in collusion with others." The policy defined "theft" as "the unlawful taking" of money, securities, or other property to the deprivation of the insured. In this context, therefore, "discovery of the loss" is not satisfied by mere suspicion—however reasonable—that Su unlawfully took or conspired with others to take Nike's money or property. Rather, for Nike to be charged with discovery of the loss, Nike had to have knowledge of specific facts that reasonably would cause a person to conclude that Su's actions were unlawful.

■ No one disputes that Nike knew that Su had violated its stated policies regarding acceptance of postdated checks and obtaining adequate collateral for the distribution agreement. Without more, however, losses from those "unauthorized" acts are not covered losses. Knowledge that an employee has violated company policy does not necessarily imply "discovery" of the fact that the employee has committed theft. *See Federal Deposit Insurance Corporation v. Lott,* 460 F2d 82, 86-87 (5th Cir 1972) ("The fact that the directors may have had knowledge of irregularities and violations, i.e.,

---

[9] It is worth noting that the definition of "discovery of a loss" that we adopt in this context is consistent with the definitions of "discovery" that the Oregon Supreme Court and this court have adopted for other purposes. *See Mathies v. Hoeck,* 284 Or 539, 542-43, 588 P2d 1 (1978) (interpreting the phrase "discovery of the fraud or deceit," as used in ORS 12.110); *Widing v. Schwabe, Williamson & Wyatt,* 154 Or App 276, 283-84, 961 P2d 889 (1998) (same; "discovery" does not require that "the plaintiff is or should be aware of the full extent of his or her damage or of all the details relevant to the claim"). *See also Gaston v. Parsons,* 318 Or 247, 255-56, 864 P2d 1319 (1994) (interpreting the ORS 12.110(4) two-year tort statute of limitations, which is triggered by discovery of injury, to require more than "a mere suspicion" of an actionable injury).

the holding of excessive cash items and exceeding the legal loan limit, is not by itself sufficient to trigger the bank's obligation to notify Aetna"); *United States Fidelity & Guar. Co. v. Empire State Bank,* 448 F2d 360, 365 (8th Cir 1971) (knowledge that "loans had been made with inadequate collateral, to a corporation controlled by [X], a person having an unsavory personal, and unsatisfactory credit, reputation" is not sufficient to constitute discovery of dishonesty). Indeed, an employee's violation of company policy does not necessarily establish even that the employee intended to harm, rather than help, the employer. *See First Nat. Bank of Louisville v. Lustig,* 961 F2d 1162, 1165 (5th Cir 1992) ("A bank employee may commit dishonest or fraudulent acts with an intent to harm the bank or with an intent to benefit it."). Thus, whether Su's actions amounted to theft comes down to a question of his intent: Did Su merely make poor business judgments that LIFE, without Su's complicity, took advantage of in order to leave Nike holding an unrecoverable debt? Or did Su violate Nike's policies with an intent to help LIFE achieve that end? The point at which Nike "discovered" the loss turns on identifying when Nike had sufficient facts to conclude that Su acted with the necessary mental state.

Northwestern argues, as it did below, that Nike "knew the facts and appreciated their significance" by the time it filed its complaint with the Taiwan public prosecutor in March 1992. Northwestern reasons that, by then, Nike had conducted a full investigation and had all of the facts before it. The filing of the complaint, in Northwestern's view, establishes that Nike knew the significance of those facts, because the complaint charged that Su "worked in collusion" with the Huangs and with the "intent" to cause injury to Nike and gain illegal profit. In essence, Northwestern's point is that a jury could reach no conclusion other than that Nike had discovered the theft at the point that Nike, relying on the investigative report it had compiled, publicly charged Su with criminal conduct and submitted that charge to government officials.

At first blush, Northwestern's argument is inviting, because of the seriousness that typically attends a public charge of criminal conduct and the fact that Nike made that charge on the basis of its completed investigation. On this

record, however, there are at least two problems with Northwestern's argument that the criminal complaint forecloses a jury question as to what Nike reasonably knew at that point. The first problem is the nature of the complaint itself. The complaint did not allege that Su had committed "theft," but rather that he had committed the Taiwanese criminal offense of "breach of fiduciary duty." That offense, as defined in the statute cited by Nike and by the Taiwan prosecutor, requires only that the person act "contrary to his duties," that the principal be harmed, and that the person act "with intent to procure an illegal benefit for himself or for a third person *or* to harm the interests of his principal" (emphasis added). In contrast, "theft," as defined in the policy, requires an "unlawful taking," which the parties agree requires the intent to commit theft. An intent to "harm the interests of [the] principal," which by itself can suffice to establish the Taiwanese offense, is not the same.

In that regard, it is worth pointing out that, in denying Nike's claim, Northwestern took exactly that view of Nike's complaint. The denial letter stressed that the complaint Nike lodged with the Taiwan prosecutor did not "allege any acts of theft by Mr. Su" and instead alleged "only a series of company policy violations by Mr. Su in connection with sales to LIFE." That is at least a reasonable view of the complaint, and one that a jury would be entitled to take. For that reason, the complaint does not establish Nike's discovery of the loss as a matter of law.

There is, moreover, a second problem with Northwestern's argument. Neither party placed anything in the record to demonstrate what level of knowledge or information is required under Taiwanese law for a person to file a complaint of this kind. Nor is the record clear on what function such a complaint performs. In its appellate briefing, Nike cites specific portions of the Taiwanese criminal code of procedure providing that a complaint may be filed by a person "with suspicion" that an offense has been committed and that the filing of such a complaint serves to require the public prosecutor to investigate the matter.[10] It appears from those

---

[10] Specifically, Nike cites the Taiwan Code of Criminal Procedure, Articles 228, 240, and 252 (*Major Statutes of the Republic of China* (Vol II: Civil and Criminal Statutes), at 479, 482, 484 (Republic of China, June 1992)).

portions of the code—and the record also suggests—that a complaint is not a charging instrument but only prompts an investigation by the prosecutor that may or may not lead to a formal charge. Northwestern does not take issue with the law as represented by Nike, and, for present purposes, we accept it. *See Warm Springs Forest Products Ind. v. EBI Co.*, 300 Or 617, 621, 716 P2d 740 (1986) (under OEC 202, trial and appellate courts may take judicial notice of statutory law of foreign nations). Thus, viewing the significance of Nike's filing of the complaint in a light most favorable to Nike, a jury could conclude that Nike merely suspected Su of intentionally colluding with LIFE to create an unrecoverable debt, that Nike did not yet have all the evidence it needed, and that the purpose of the complaint was to spark an investigation by Taiwanese officials that Nike hoped would verify Nike's suspicions. So viewed, the complaint does not compel a conclusion that Nike had discovered its loss as of March 1992.

Northwestern next points to December 1992 as an alternative time at which Nike should be held as a matter of law to have knowledge of its loss. That is when Nike filed its proof of loss and supporting documents with Northwestern. Relying extensively on a statement Northwestern later took from Bolton, in which Bolton described what Nike knew about Su's and LIFE's activities and his own conclusions as to Su's and LIFE's intent, Northwestern argues that Nike knew and understood the significance of the facts it had by the time that it filed the proof of loss.

Bolton's statement, however, demonstrates far more uncertainty on Bolton's (and, hence, Nike's) part than Northwestern acknowledges. Bolton had ample documentation that Su had violated Nike's policies with respect to acceptance of postdated checks, price discounts on orders, and high-volume purchases. But, as already discussed, an employee's violation of an employer's policies, without more, generally is not enough to establish an employee's intentional act of theft, as opposed to mere negligence or misjudgment. On this record, Su's violations of Nike's stated policies are particularly unrevealing as to his intent because the violations he committed were not unusual. As Bolton acknowledged, it was common practice in Taiwan to accept checks postdated by more than Nike allowed, and Su did so for many

of Nike's long-term customers, not just for LIFE. Bolton knew that most of the sales staff, not just Su, commonly gave unauthorized price discounts for orders not placed sufficiently in advance. Bolton suspected Su was getting more than the usual "kickbacks" from LIFE, but he had no evidence of that fact, and he told Northwestern in his statement that "[n]ever in a million years could anybody prove it." Thus, Su's activities may have reflected business as usual—albeit risky business—and may not have signaled his participation in a scheme to steal from Nike.

In urging that Bolton's statement reveals that Nike knew the nature of its loss by the time it filed its proof of loss, Northwestern appears to rely less on the factual information available to Bolton and more on Bolton's conclusions as to the significance of those facts—*i.e.*, that Su intentionally colluded with the Huangs. In that respect, Northwestern overstates the record. Bolton believed that Su may have cooperated with LIFE to mask the amount of debt it was accumulating, but he knew that he had no specific facts to support his belief. For that reason, Bolton also viewed Su's motives as potentially benign. Bolton believed that Su may have been motivated only by a desire to maximize his commission (which was tied to sales generally, not to sales to LIFE or other specific customers). Bolton also speculated that, at least until LIFE defaulted, Su believed LIFE would honor all of its checks, as it always had in the past, and that Su probably "felt like they had a good thing going" because everybody, including Nike, was making money.

A reasonable factfinder could conclude from Bolton's statement that the information available to Nike was inconclusive on Su's intent and that Bolton's own belief that Su intentionally aided the Huangs in defaulting on their debt was both equivocal and speculative. That view of Bolton's statement is bolstered by Northwestern's own denial of the claim. In its denial letter, Northwestern relied in part on Bolton's statement to support its conclusion that the available information was not sufficient to establish that a covered loss (*i.e.*, a theft) had occurred. The letter observed:

"Taken together, the documentary evidence presented by Nike, along with Mr. Bolton's statement, strongly indicate that Mr. Su believed Nike Taiwan's sales to LIFE to be

legitimate business transactions—even though Mr. Su may have violated various company policies in connection with those sales. [Northwestern's] policy covers only employee theft, not violations of company policy. [Northwestern] is aware of no evidence that Mr. Su intended to or did steal from Nike Taiwan in any way."

Northwestern's denial of Nike's claim takes a reasonable view of the information available to Nike when it filed the proof of loss, one that a jury could take as well.[11]

Northwestern's final argument in support of summary judgment is that Nike was obligated to file this action within two years of its proof of loss because, in all events, Nike acquired no additional information after that time. Said another way, Northwestern contends that everything Nike knew and now relies on for its claim was knowledge that it had by then. Thus, if the information Nike relies on now is adequate to establish a covered loss, then Nike must have known of its loss at least by December 1992, because the same information was available to it then.

Nike implicitly agrees that if nothing new had come to light after that date, the action would be barred. But Nike takes the position that something new and significant in fact occurred: The Taipei prosecutor indicted Su and, in the indictment, provided Nike with additional evidence bearing on Su's state of mind. The indictment recited that, "[i]n the course of court examination," both Su and the Huangs directly denied that Su was responsible for allowing LIFE to pay with excessively postdated checks and for giving LIFE price discounts on orders placed less than six months in advance. Instead, they maintained that Nike's financial department in Taiwan had permitted the checks and the discounts. The public prosecutor issued the indictment based in

---

[11] By quoting Northwestern's denial letter, we do not endorse Nike's claim that, because of the content of that letter, equitable estoppel bars Northwestern from contending that this suit was not timely filed. As noted earlier, see note 8, we do not reach that contention. Nevertheless, to the extent that the denial letter takes a reasonable view of the information then available to all concerned—and we believe it does—the emphatic position taken in the denial letter severely undercuts Northwestern's present position, which is that the available information does demonstrate such a discovery as a matter of law.

part on his conclusion that those were obvious lies, as evidenced by Nike's conclusive documentary evidence. Nike argues that, just as the prosecutor found those lies to have significant bearing on Su's intent, Su's in-court dishonesty likewise provided added evidence in support of Nike's claim of loss. Nike therefore contends that, in light of that new evidence, it had two years from February 1994, when the indictment issued, to file this action.

This particular point of dispute between the parties was a central focus of the parties' arguments below and the basis of the trial court's summary judgment ruling. In response to Nike's reliance on the indictment, Northwestern urged that the "court examination" referred to in the indictment, in which Su allegedly lied about his activities, consisted of three or four preliminary hearings that Nike's lawyers attended and that took place before Northwestern took Bolton's statement in June 1993. Northwestern contended that Nike was not entitled to rely on the indictment as providing new information because Nike, at least by June 10, 1993, already knew about Su's in-court testimony. The trial court agreed with Northwestern. The trial court concluded that "[a]ll the pieces were there by June 10th of 1993," including Su's "incredible story" at the court hearing where Su denied, in the presence of Nike's lawyers, his responsibility for the violations of Nike's policies.

The problem with the trial court's reasoning, as Nike points out and as Northwestern now concedes, is that the summary judgment record does not support it. Bolton's statement in June 1993 referred to three or four preliminary hearings attended by Nike's lawyers. But he described them as having been, "at best, inconclusive" and as not leading to any charges by the prosecutor. The date of the court examination referred to in the indictment is not in the summary judgment record. There is no evidence that Nike's lawyers attended that examination; nor is there any evidence that Nike's lawyers were even aware of it. In short, nothing in the record establishes that the "preliminary hearings" to which Bolton referred and at which Nike lawyers were present were the same "court examination" to which the Taiwan prosecutor later referred in the indictment. Northwestern now agrees that, viewing the record in the light most favorable to Nike,

we must conclude for present purposes that the first that Nike knew of Su's in-court denials of his responsibility for violating Nike's policy was when the indictment issued in February 1994.

Nevertheless, Northwestern now asserts that Su's lies about his activities did not add anything meaningful to what Nike knew. We disagree that a jury could not reasonably conclude otherwise. Su, when confronted by Bolton, did not specifically lie about anything. Su's earliest statements to Bolton either made no sense, or led Bolton to believe that Su did not have a clue as to the Huangs' financial situation or was unwilling to tell what he knew. In the meeting that led to his firing, Su was unresponsive and said nothing. Any number of less culpable mental states reasonably could be attributed to Su's "blank stare," such as surprise by LIFE's default or Su's embarrassment and shame due to his own poor judgment. In contrast, a fac finder at least reasonably could conclude that Su's later willingness in court to deny his violations of Nike's policy was much more telling and reflected a guilty state of mind that, until then, Su had not revealed.

To be sure, a factfinder might not attribute that significance to the information revealed by the indictment. The point, however, is that a factfinder reasonably could do so. This is not a case "where only one conclusion can reasonably be drawn from the evidence." *Mathies v. Hoeck*, 284 Or 539, 543, 588 P2d 1 (1978). The problem here is the same as in a number of other reported cases involving an employer's knowledge that it has lost money due to the actions of an employee: It is not always apparent from the fact of the loss that the employee's conduct was dishonest, as opposed to merely negligent. As other courts have concluded in similar situations that turn on an employee's intent, the evidence is often circumstantial and depends on what inferences may be drawn from it. Where that is true, disputes as to when the information known to the employer crosses the less-than-bright line between suspicion of the employee's intent and knowledge of that intent generally present "question[s] of fact which will generally not be subject to summary judgment." *Lustig*, 961 F2d at 1165-66. *See also Central Nat. Life Ins. v. F. & D. Co. of Md.*, 626 F2d 537 (7th Cir 1980) (whether employee's acts were due to incompetence or fraud

were questions of fact). This is not the relatively rare case in which the record demonstrates evidence of intent that is unequivocal enough to warrant summary judgment. Here, a question of fact remains as to whether Nike had sufficient knowledge to reasonably conclude, more than two years before this action, that Su intentionally conspired with the Huangs to cause Nike's loss and, if not, whether the February 1994 indictment provided Nike with new evidence of Su's intent. Accordingly, the grant of summary judgment to Northwestern was error.

Reversed and remanded.