Don **STARR** and Karen Starr, husband and wife, d/b/a Starr Farms, Plaintiffs,

v.

**DOW AGROSCIENCES LLC**, a Delaware Limited Liability Company, the Dow Chemical Company and Rohm & Haas, an unknown foreign company, Defendants.

No. Civ. 03–830–MO.

United States District Court, D. Oregon.

Aug. 11, 2004.

Jonel K. Ricker, Ricker & Roberson, LaGrande, OR, Richard M. Layne, Layne & Lewis, LLP, Portland, OR, for Plaintiffs.

Dean T. Barnhard, William E. Padgett, Barnes & Thornburg LLP, Indianapolis, IN, Ronald E. Bailey, Stephen F. Deatherage, Leta E. Gorman, Bullivant Houser Bailey, Portland, OR, for Defendants.

## OPINION AND ORDER

MOSMAN, District Judge.

Plaintiffs Don and Karen Starr are residents of Summerville, Oregon where they make their living as mint farmers. Against three nonresident companies, the plaintiffs assert several common law theories, alleging that the application of a herbicide manufactured by defendants caused reductions in their mint-crop yield for 2001. Defendants respond that plaintiffs' claims are preempted by federal law, specifically, the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") and its implementing regulations. Defendants further argue that, even if the claims are not preempted, the claims are invalid under state law. Defendants, therefore, filed

a motion for summary judgment aimed at all of plaintiffs' claims. (Doc. # 13). For the reasons outlined below, defendants' motion is granted in full.

## I. BACKGROUND

This case involves mint farmers' application of a herbicide sold under the trademark "Goal" and manufactured by defendants. Mint farmers use Goal to control the growth of various types of weeds. Defendant Rohm and Haas manufactured and marketed the herbicide prior to May 31, 2001; thereafter, defendant Dow Agrosciences began manufacturing and marketing the product.

As required by FIFRA, sometime in 1995, Rohm and Haas submitted scientific data relevant to the Goal herbicide for approval by the Environmental Protection Agency ("EPA"). The EPA concluded that the scientific data showed that the product satisfied FIFRA. The agency also approved the product labels attached to the Goal containers.

During the relevant time period, the Goal product was properly registered with the EPA and sold under only the EPA-approved labels. The EPA-approved language on the Goal labels includes the following:

CONDITIONS OF SALE AND WARRANTY

Rohm and Haas warrants that the product confirms to its chemical description and is reasonably fit for the purpose stated on the label only when used in accordance with label direction under normal conditions of use. **ROHM AND HAAS MAKES NO OTHER EXPRESS OR IMPLIED WARRANT EITHER OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE.** Handling, storage and use of the product by Buyer or User are beyond the control of Rohm and Haas and Seller. Risks such as crop injury, ineffectiveness or other unintended consequences resulting from, but not limited to, weather or soil conditions, presence of other materials, disease, pests, drift to other crops or property or failure to follow label directions will be assumed by the Buyer or User. **IN NO CASE WILL ROHM AND HAAS OR SELLER BE HELD LIABLE FOR CONSEQUENTIAL, SPECIAL OR INDIRECT DAMAGES RESULTING FROM THE HANDLING, STORAGE, OR USE OF THIS PRODUCT.**

Kaminski Decl. ¶ 10 & Ex. 1 (emphasis in original). The label also expressly warned consumers that "[a]pplications should only be made to spearmint and peppermint that are dormant." *Id.* When applied to mint crops, the labeling continued: "Control of annual grasses is best obtained when [Goal] herbicide is applied prior to emergence [*i.e.*, when dormant]. Postemergence control of winter annual grasses is generally unsatisfactory if applications are made after the 1– to 2–leaf stage." *Id.* The parties agree, to avoid damaging a mint crop, Goal herbicide must be applied preemergence, while the crop is dormant. A crop is dormant when no green vegetation has yet emerged from the ground.

It is undisputed that crops are damaged upon contact with Goal herbicide, because it is a "contact" (as opposed to "systemic") herbicide, meaning it is poisonous to plants as soon as it touches the plant tissue. But only that part of the plant touched by the herbicide is damaged. In contrast, a plant absorbs a systemic herbicide, meaning that limited contact to the herbicide will harm the entire plant.

Plaintiffs purchased the Goal herbicide at issue sometime in March 2001, at which time Rohm and Haas was still selling it. In connection with their purchase of the Goal product, plaintiffs dealt with Rohm

and Haas company representative Richard McDonough. It appears he visited plaintiffs' farm on at least two occasions to observe the mint fields. He also had telephone conversations about Goal with plaintiffs.

The parties sharply disagree about the content of the conversations between plaintiffs and McDonough. According to plaintiffs: McDonough interacted directly with Clint Porter, a licensed chemical spray applicator, who was to apply Goal to plaintiffs' mint crops. Porter did not work for plaintiffs, but rather worked for the local agricultural supply business which sold the Goal product to plaintiffs. McDonough allegedly instructed Porter regarding the time, method, and rate of application. McDonough allegedly told Porter, "now looks good," while they were walking plaintiffs' mint fields, thus causing Porter to apply the herbicide even though the mint crops were not dormant. Within hours of McDonough's alleged statement, on March 6, 2001, Porter began applying the herbicide to the crops.

As a result of the application of Goal to their crops, plaintiffs allege that there was a reduction in their mint-oil yield in 2001. They allegedly did not discover the full extent and nature of their loss until sometime in July 2001.

Plaintiffs filed this lawsuit in state court on May 23, 2003. They asserted three counts, breach of contract, negligence, and gross negligence. Plaintiffs' breach-of-contract count is based on the allegation that defendants breached implied warranties of merchantability and fitness for a particular purpose as well as an express warranty. Plaintiffs based their negligence count on the following alleged actions and omissions by defendants: advising plaintiffs to use the Goal product at a time when it should have been known the product would not be effective, thus effec-

tively failing to follow defendants' own research and application instructions; failing to inspect and analyze all relevant conditions affecting the proper application of Goal; failing to disclose to plaintiffs that defendants had seen similar mint crop damage in the past; failing properly to research the proper application conditions for the product to mint crops; and failing to comply with applicable federal and state regulations. Plaintiffs also alleged that their allegations establish gross negligence and strict liability.

Defendants eventually removed the case to this court, on June 20, 2003. On April 30, 2004, defendants moved for summary judgment based on several grounds. On July 19, 2004, the court heard argument on defendants' motion.

## II. DISCUSSION

The parties devote most of their argument to the issue of whether FIFRA preempts plaintiffs' claims. Because the court finds that the claims fail under state law, however, the court need not discuss the FIFRA issue. Specifically plaintiffs' claims fail for at least two reasons: First, defendants effectively disclaimed liability for the damages plaintiffs seek in connection with their breach-of-contract count. Second, plaintiffs cannot recover on their negligence count because the limitations period has run.

### A. Damages Disclaimer

As mentioned, plaintiffs assert a breach-of-contract count, which in turn is based on breach-of-warranty theories. Plaintiffs also assert negligence claims. Defendants argue that the Goal label's damages disclaimer bars all of plaintiffs' claims. As briefly discussed below, the court finds that, although the disclaimer does not bar plaintiffs' negligence claims, the disclaimer

operates to prevent plaintiffs from recovering under a warranty theory.[1]

The Goal label provided:

**IN NO CASE WILL ROHM AND HAAS OR SELLER BE HELD LIABLE FOR CONSEQUENTIAL, SPECIAL, OR INDIRECT DAMAGES RESULTING FROM THE HANDLING, STORAGE OR USE OF THIS PRODUCT.**

(Emphasis in original).

 Despite the disclaimer's unequivocal language, under the particular facts presented, the court agrees with plaintiffs that the disclaimer should not be applied against their negligence claims. Under Oregon law, when a party to a contract "seeks to contract away liability for its own negligence in advance of any harm, the intent to do so must be 'clearly and unequivocally expressed.'" *Steele v. Mt. Hood Meadows Oregon, Ltd.*, 159 Or.App. 272, 276, 974 P.2d 794 (1999) (quoting *Transamerica Ins. Co. v. U.S. Nat'l Bank*, 276 Or. 945, 951, 558 P.2d 328 (1976)). Absent express language showing an intent to disclaim damages for "negligence," a party invoking the disclaimer carries a heavy burden to show that the parties nevertheless understood that the disclaiming party would not be responsible for its negligent actions. See *id.* at 277–78, 974 P.2d 794.

 In this case, defendants have not shown that plaintiffs must have understood they would not be able to recover for an agent's negligence, much less negligence occurring in the course of an agent's participation in applying Goal to a particular field. The Goal label does not mention "negligence," nor does it otherwise use clear language informing buyers the company will not be responsible for its agents' unreasonable conduct. In short, even though this case involves only property damage, defendants do not make the threshold showing that the label, read as a whole, sufficiently put buyers on notice they could not recover for defendants' negligence.

But, as plaintiffs themselves recognize, the Goal label plainly sought to limit liability for "warranty claims." See Plaintiffs' Supplemental Brief at 4. Plaintiffs' warranty claims are based on defendants' alleged breach of the sale contract for the Goal herbicide applied to plaintiffs' crops. For the reasons briefly discussed below, the terms of that contract do not permit plaintiffs to recover their consequential loss arising from the alleged breach.

 Article 2 of the UCC, as adopted by the Oregon legislature, considers the validity of "limitation of remedy" clauses, providing in pertinent part:

> Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

ORS 72.7190. Thus, as a general matter, the UCC allows sellers to disclaim liability for consequential damages, as long as any disclaimer is limited to economic losses.

As an example of how this disclaimer provision operates, defendants rely on *Duyck v. Northwest Chemical Corp.*, 94 Or.App. 111, 764 P.2d 943 (1988), which involved a disclaimer clause almost identical to the one at issue here. In *Northwest Chemical*, plaintiffs sought damages pur-

---

**1.** At the July 19 oral argument, the court gave plaintiffs another opportunity to brief the effect of the label's damages disclaimer, even though they did not at all mention this determinative issue in their original summary judgment briefing.

suant to an express-warranty theory for reductions in their blueberry-crop yield, allegedly due to the application of defendant's insecticide. *Id.* at 113, 764 P.2d 943. The plaintiffs alleged that defendants' agent wrongly told plaintiffs the insecticide was safe for use on their blueberry crops.

The court found that the resulting damage to the blueberry crops was consequential, rather than direct, in nature. *Id.* at 117, 764 P.2d 943. Finding the contract's disclaimer of liability sufficiently conspicuous, the court held that, even if plaintiffs could show breach of an express warranty, the damages disclaimer barred plaintiffs from recovering for their reduced blueberry yield. *Id.* at 117–18, 764 P.2d 943; *see also* James J. White & Robert S. Summers, *Uniform Commercial Code* § 12–8 ("if the seller has complied with all statutory requirements [regarding the waiver of remedies] the buyer will be barred from recovering consequential damages such as for *lost crops* or injury to property." (emphasis added)).

 In the case at bar, plaintiffs seek $170,000 in economic damage for the alleged loss of yield from their mint crops. Plaintiffs do not dispute that their loss was consequential in nature. Nor do they contend that the Goal label's damages disclaimer was insufficiently conspicuous or unenforceable for any other reason. Un-

der these circumstances, the court concludes that defendants validly disclaimed liability for plaintiffs' alleged losses, thus preventing any recovery under a breach-of-warranty theory.[2]

## B. Statute of Limitations

It is undisputed that plaintiffs' warranty-based claims, which are barred for the reasons discussed above, are not also barred by limitations, in light of the longer limitations periods applicable to warranty claims. But the limitations defense does bar plaintiffs' remaining claims which are based on negligence.

As a threshold matter, although the parties agree that a two-year limitations period applies to plaintiffs' negligence claims, the parties disagree about whether a discovery rule also applies. Defendants argue that plaintiffs' claims taken together constitute a products liability civil action which, in turn, would mean no discovery rule applies. *See* ORS 30.905(2) (2003) (providing, "a product liability civil action shall be commenced not later than two years after the date on which ... damage complained of occurs").[3] As defendants point out, courts have construed the term "product liability civil action" broadly, as essentially encompassing "all products-related claims within the breadth of the products liability statute." *Bancorp Leas-*

---

**2.** Plaintiffs argued that the label's language could not be relied upon to show disclaimer of liability for breach of an express warranty. They still do not, however, explain why the *damages* disclaimer was ineffective. Even assuming plaintiffs are not barred from pursuing a contract claim based on an express-warranty theory, the damages disclaimer bars plaintiffs from recovering the *type* of damages sought. As explained by the Oregon Court of Appeals:

> The consequential damage remedy is separate from creation of liability by a warranty. Warranty disclaimer is a defense to the

existence of a cause of action, while the consequential damage limitation merely restricts remedies once the breach has been established.

*Northwest Chem.* 94 Or.App. at 117, 764 P.2d 943 (citation omitted).

**3.** The Oregon Legislature has since added a discovery-rule provision to ORS 30.905(2) (2004). The legislature, however, made clear this new provision applies only to damage which "occurs on or after the effective date" of the amendment, January 1, 2004. *See* Or. Laws 2003, ch. 768 § 2.

*ing & Fin. Corp. v. Agusta Aviation Corp.,* 813 F.2d 272, 277 (9th Cir.1987).

At oral argument, plaintiffs conceded that application of the products-liability limitations provision would bar their claims.[4] They respond, however, that their claims are not based on any product defect. Instead, they argue, their claims constitute simply a negligence cause of action unrelated to any product defect, because their lawsuit is based on McDonough's negligent judgment regarding when to apply Goal to plaintiffs' crops.[5] Plaintiffs, therefore, urge the court to apply a discovery rule. As briefly discussed below, even applying a discovery rule in this case, plaintiffs' negligence-based claims are barred as a matter of law. Accordingly, the court does not decide whether plaintiffs have asserted a products liability civil action, to which no discovery rule would apply.

■ Discovery rules are "designed to give plaintiffs a reasonable opportunity to become aware of their claim." *Gaston v. Parsons,* 318 Or. 247, 255–56, 864 P.2d 1319 (Or.1994). Oregon courts have, as plaintiffs suggest, applied a discovery rule to negligence-based claims. In the course of deciding a medical-malpractice case, for instance, the Oregon Supreme Court discussed the usual contours of a discovery rule: "the statute of limitations begins to run when the plaintiff knows or in the exercise of reasonable care should have known [of]facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation, and tortious conduct) exists." *Id.* at 256, 864 P.2d 1319. Especially pertinent to the case at bar, the Oregon Supreme Court also has observed that, under prevailing case law," the statute of limitations on a claim for negligent misrepresentation begins to run when the plaintiffs knew or should have known that they had a loss caused by their reliance upon the defendant's information." *Duyck v. Tualatin Valley Irrigation Dist.,* 304 Or. 151, 162, 742 P.2d 1176 (1987).

■ Applying discovery-rule principles to this case does not save plaintiffs' negligence-based claims. It is undisputed that Goal damaged plaintiffs' mint crops when the product was applied, in early March 2001.[6] Under a discovery rule, that fact alone would not support defendants' limitations defense. But plaintiffs' own evidence shows any claim based on McDonough's allegedly negligent advice fails even under a discovery-rule analysis. Specifically, as described by plaintiffs' own expert, the facts were such that plaintiffs either did know or should have known about their claim more than two years before they filed this lawsuit:

> *Within two weeks of the application of GOAL 2XL, as directed by Mr. McDonough, these mint fields, and only these*

---

4. Accordingly, to the extent plaintiffs are still pursuing any claim based on strict-liability theory, summary judgment is granted against that claim.

5. As mentioned, in their complaint, plaintiffs also asserted other negligence allegations, including that defendants negligently tested Goal and failed to disclose fully to plaintiffs the risks of using Goal. Plaintiffs fail to offer any evidence to support any of their negligence-based allegations, with the exception of the allegations directly related to McDon-

ough's advice. Moreover, as these other allegations readily fit within the definition of "product liability civil action," see ORS 30.900, any claims based on them would be barred by the product liability limitations period. Thus the court considers plaintiffs' negligence claims to be based solely on McDonough's alleged negligent judgment as to whether the fields were dormant.

6. Again, Goal is a "contact" herbicide which means it poisons plants upon contact.

mint fields *were showing severe chemical injury* in a specific symtomology, pattern, and timing which *could only reasonably be attributed to injury from the GOAL 2XL herbicide,* applied after the mint had broken dormancy.

Plaintiffs' Ex., Aff. of Stuart A. Turner § 7 (emphasis added). Thus the evidence submitted by plaintiffs shows that by about the third week of March their mint crops were severely damaged as a result of McDonough's alleged misrepresentations. Plaintiffs did not file this lawsuit until May 23, 2003, more than two years later.

At oral argument, for the first time, plaintiffs' counsel argued that there is a difference between what an expert should have known and what a reasonable mint farmer should have known. While the court might agree with that proposition in the abstract, it is unsupported by anything in the record. Mr. Turner's expert affidavit stated that by the end of March 2001 the mint crops "were *showing*" severe damage. (Emphasis added). Based on Mr. Turner's affidavit, it is only reasonable to infer that his conclusion the crops "were showing" damage was based, at least in part, on his conversations with the plaintiffs themselves. See Aff. of Turner ¶¶ 5–6 (averring he obtained information about case by reviewing depositions and "interview[ing] grower Don Starr at length"). It is also reasonable to assume that mint crops showing "severe damage" would put a mint farmer on notice. In any event, nothing in this record contradicts the rather forceful language from plaintiffs' own expert that the damage, and reasons for the damage, were unmistakable at least by April 1, 2004.

▮ Moreover, plaintiffs' only statement regarding the limitations issue in their briefing further indicates they in fact did know, soon after the application of Goal, about the existence of at least some

harm to their crops: *"Full discovery* of the nature and *extent* of Plaintiffs' crop loss and damage occurred in July 2001." See Plaintiffs' Memorandum in Opposition at 7 (emphasis added). Commencement of the limitations period under a discovery rule, however, does not depend on plaintiff's having actual or inquiry knowledge of "all of the particulars of his or her ultimate injury." *Widing v. Schwabe, Williamson & Wyatt,* 154 Or.App. 276, 283, 961 P.2d 889 (1998). "Rather, the rule delays the running of the limitation period only until the plaintiff knows or should know that *some* harm has been incurred and that *a* claim exists." *Id.* (emphasis in original); see also *Tualatin Valley,* 304 Or. at 163–64, 742 P.2d 1176 ("Nor is the statute suspended for purposes of allowing a plaintiff to develop facts to support or identify a theory of recovery or, as stated by the Court of Appeals, to learn all of the facts which they might ultimately be able to advance to support their claim." (citation omitted)).

In sum plaintiffs simply have not articulated any reasonable inference presented by the record aside from the inference that experienced mint farmers, such as plaintiffs, should have known, before May 23, 2001, about the existence of harm to their crops resulting from the application of Goal. Indeed, as mentioned above, the record and plaintiffs' own arguments indicate that they *did know* their crops had suffered some damage.

Accordingly, in light of plaintiffs' failure to point out any countervailing evidence or otherwise elaborate on the limitations issue, the court finds Mr. Turner's unequivocal conclusions to be sufficient to satisfy defendants' initial burden of showing that the record contains no material issue of fact precluding summary judgment on limitations grounds. The plaintiffs failed to carry their burden of pointing out other

"specific facts showing that there is a genuine issue for trial." *Far Out Productions v. Oskar*, 247 F.3d 986, 997 (9th Cir.2001).[7]

## III. CONCLUSION

For the foregoing reasons, plaintiffs' two disputed counts—one based on negligence and the other based on contract—fail as a matter of law. In addition, because defendants established that any strict-liability or gross-negligence claim fails as a matter of law, and plaintiffs did not respond with any contrary arguments, the court also grants summary judgment against those claims. Thus summary judgment is granted in full (doc. # 13), and all other motions, if any, are denied as moot.

IT IS SO ORDERED.

---

**7.** The court also notes that, while not directly relevant under an application of the discovery rule, this is not a case in which plaintiffs were unaware of the full extent and nature of their loss during the entire limitations period. Rather, by plaintiffs' own admission, they obtained such knowledge at the latest in July 2001, thus still affording them well over a year's time in which to file suit.