**Robert A. TOWNE, Cynthia J. Towne, and Towne–Murphy, Inc.,**
**Plaintiffs,**

**v.**

**Anthony ROBBINS, Becky Robbins, Robbins, Robbins Research International, Inc., Anthony Robbins & Associates, Inc., The Anthony Robbins Companies, Brad N. Hunsaker, and Sam Georges, Defendants.**

**Civil No. 02–1688–MO.**

United States District Court,
D. Oregon.

Oct. 12, 2004.

See, also, 331 F.Supp.2d 1269.

---

C. Thomas Wesner, Jr., Wesner Coke & Clymer, P.C., Dallas, TX, J. William Savage, Savage Bowersox Supperstein, LLP, Portland, OR, for Plaintiffs.

Alec J. Shebiel, Joy Ellis, Keith S. Dubanevich, Michael Ryan O'Connor, Robert C. Weaver, Jr., Garvey Schubert Barer, Portland, OR, Daniel J. Friedman, Daniel G. Murphy, Peter S. Selvin, Loeb & Loeb, LLP, Los Angeles, CA, for Defendants.

## OPINION AND ORDER

MOSMAN, District Judge.

In this franchise dispute, plaintiffs bring several claims against well-known motivational speaker Tony Robbins and his companies. On September 7, 2004, the court held that plaintiffs' claims under the Oregon Franchise Act were largely barred by the Act's limitations provision. See *Towne v. Robbins*, 331 F.Supp.2d 1269 (D.Or. 2004). The issue now before the court is whether plaintiffs' ORICO, RICO, fraud, and special-relationship claims also are time barred. For the reasons discussed below, the court holds that these claims are barred, except to the extent a RICO claim can be based on events occurring within four years of this lawsuit and fraud and special-relationship claims can be based on alleged misrepresentations which occurred in connection with the 2001 decision to continue their franchise. Thus defendants' motion for partial summary judgment regarding limitations is GRANTED IN PART AND DENIED IN PART. (Doc. # 154).

## I. BACKGROUND

The court discusses only those facts—as construed in favor of the non-movant plaintiffs—which are considered relevant to the limitations issues presented. In September 1990 plaintiff Robert Towne left his job as an account manager at a California software company to join Robbins Research International ("RRI"). At that time, Mr. Robbins used RRI to distribute his motivational tapes and other related products. In deciding to enter into a business relationship with Robbins, the Townes expressed as a primary goal gaining "financial independence by 1997." In addition, in their original application submitted to Robbins, the Townes, relying on materials provided by Robbins, projected they would earn about $250,000 in net income in distributing Robbins' products. Ms. Towne, in her deposition, stated that this $250,000 projection was important to their decision to enter into the business relationship, and, according to her: "No one from [any Robbins company] said it was unachievable. No one said it was overstated.'" Persuaded the distributorship provided "an unprecedented business opportunity," the Townes moved to Portland from California to begin acting as distributors for RRI.

Sometime in late 1990 or early 1991, Robbins decided to convert his mode of business from distributorships to franchising operations. The distributorship agreements gave distributors a right of first refusal to become franchisees. The Townes were assured that a conversion to franchising operations presented the "superior" business model. For instance, Brad Hunsaker, a high-level employee of the Robbins organization, told the Townes that operating a "Portland franchise would

be more profitable than the distributorship."

As required by the Federal Trade Commission, Robbins submitted to prospective franchisees a Uniform Franchise Offering Circular ("UFOC"), an informational packet organized by the Robbins organization disclosing information pertinent to deciding whether to enter into a franchise agreement. The UFOC stated that at least two lawsuits alleging fraud had been filed against RRI by former distributors. The UFOC also informed potential franchisees that the franchisor would not be RRI but a new company created by Mr. Robbins, Anthony Robbins & Associates ("ARA").

Without reviewing in any detail the UFOC or showing it to their lawyers, Mr. Towne, his wife Cynthia Towne, and another couple, Randy and Kathleen Murphy, teamed up and decided to enter into a franchise agreement offered by ARA in July 1991. The Townes and Murphys created a new company to act as franchisee and called it Towne–Murphy, Inc.[1] The 1991 franchise agreement had a life of five years with a renewal option.

In the early '90s, however, the Townes were not successful. In their complaint, the Townes contend that they made little money from 1991 through 1996, despite Robbins' promise of significant profits. Specifically, in 1991 and 1992 the Townes made no positive net income; in 1993, they made about $15,500; in 1994, they made about $4,500; in 1995, they made about $2,500; and in 1996, they made about $19,000. Given this track record, Mr. Towne stated he and his wife were struggling even to provide "necessities" for their children.

In fact, the performance of the franchise was so bad in 1991 that the Murphys decided to sever their ties with the Robbins organization. Mr. Murphy testified it was apparent upon reviewing his W–2 for 1991 that the business had been a complete failure. He also contemplated suing ARA. The Townes bought out the Murphys' interest for $5,000.

As mentioned, the initial franchise agreement had a renewal option which came due in July 1996. At that time, the Townes were experiencing substantial financial hardship. Nevertheless, they decided to renew the franchise agreement, signing an agreement in July 1996 which renewed the franchise relationship for an additional five years.

Aside from experiencing failures in the '90s as to their specific franchise, the Townes also discovered by at least 1993 that ARA was struggling financially. In June 1993, for instance, the Townes were informed that RRI, which was providing all the funding for ARA, was over $2 million in debt and laying off employees because it could not make payroll.

Throughout the '90s, several former distributors and franchisees brought suit against Robbins and his companies for fraud. In fact, in a 1990 memo (which the Townes never saw), Mr. Hunsaker expressed concerns about the possibility of having to confront "wholesale legal action ... in the nature of a class action or something as damaging as a RICO action ... as a result of obvious misrepresentations that were made during the early part of our history." Although it does not appear defendants were ever sued in a class action, they have been sued several times over the years. As mentioned, the UFOC disclosed two lawsuits alleging fraud claims. And, as disclosed in a 1992 memo

---

1. For ease of reference, the court will refer to all plaintiffs (Mr. Towne, Mrs. Towne, and Towne–Murphy, Inc.) collectively as "the Townes."

written by Mr. Hunsaker and sent to franchisees, five former distributors had sued RRI in three separate lawsuits. Robbins settled many of the cases which had been brought against him. Mr. Hunskaker, however, in a February 7, 1992, memo blamed the litigant-distributors themselves for the failed businesses; thus, according to Mr. Towne, he and his wife did not believe defendants were at fault for the failed businesses.

As further evidence of the widespread struggles of Robbins franchisees, defendants point to a July 4, 1993, memo sent to the Townes from a fellow franchisee stating that at least 80% of the franchisees were losing money. Thus it is clear that plaintiffs were not alone in their disappointment with their franchise's record.

Aside from private lawsuits against Robbins and his companies, the FTC in 1995 announced that RRI and Robbins had agreed to settle allegations they had made misleading earnings claims to franchisees. The settlement was publicly disclosed; the *Wall Street Journal* reported on the settlement as follows:

> The [FTC] said Mr. Robbins and his San Diego company, [RRI], have agreed to settle previously undisclosed charges that they misrepresented the earnings potential of Robbins franchisees. Mr. Robbins and his company have agreed to pay $221,260 in redress to franchisees, the FTC said. According to the FTC, "few, if any" Robbins franchisees made earnings between $75,000 and $300,000 a year, as allegedly represented by Robbins. The franchisees, who paid fees between $5,000 and $90,000 for franchises, organize motivational seminars and sell motivational tapes. Brad N. Hunsaker, director of legal services for Robbins research, said, "There are some franchisees who did, and are doing very well at this business."

Along with the other franchisees, the FTC sent the Townes a copy of its settlement with RRI. As he had grown accustomed to doing, Mr. Hunsaker wrote a memo to the franchisees spinning the FTC action: "We believe [settling with the FTC] is simply the most prudent and efficient way to resolve our dispute with the FTC concerning how we negotiated distribution agreements with our business partners in the late 1980s." The Townes emphasize Hunsaker's reference to "business partners in the late 1980s'" led them to believe the underlying conduct did not affect them, because their business agreements dated from the early '90s.

By 1997, the Townes had sunk deeper into debt. In a March 20, 1997, letter written to their mortgage company seeking relief from payments they owed for property in California, Mr. and Mrs. Towne summarized their financial difficulties which resulted from their struggling franchise and revealed their knowledge of Robbins' litigation troubles:

> We invested the last of our available savings into our new business in 1990 and 1991 which was very hard on us financially. The business did not do well from the start. It is a franchise which looked great at first, but has put over 70 business owners out of business. Many of the franchises have sued the franchisor for its lack of support and follow through on its promises. The franchisor has settled in most cases. Our business nearly bankrupt our partners . . . in late 1991. It has had some good months, but many more bad months.

Thus by 1997, plaintiffs undisputedly acknowledged that ARA had been sued numerous times and they themselves had experienced many more bad months than good.

Given the franchise's failure to generate enough revenue by which the Townes

could live comfortably, by 1996 they were looking for alternative sources of revenue. Mr. Towne began performing personal "consulting" services, which he did not disclose to defendants.[2] And, in 1999, Mr. Towne accepted a full-time position at a company called RS Medical. When he accepted that position, there were still two years remaining on his franchise agreement with ARA. By the end of 1999, the Townes made the decision to scale back substantially their franchise operations. They fired the franchise's employees.

The renewal of the franchise agreement expired in August 2001. Although they were not devoting full time to their franchise, the Townes expressed interest in possibly renewing the franchise agreement. Ultimately, on or about July 18, 2001, the Townes decided to continue the franchise agreement, allegedly because of assurances and representations made by Mr. Robbins. For instance, according to Mr. Towne's declaration, Mr. Robbins stated he would permit the Townes more freedom in their operation of the franchise and would not them hold them accountable for "performance credits," which previously had been required. According to the Townes, despite Mr. Robbins' assurances and their resultant understanding of the terms of any renewed franchise, Mr. Hunsaker, on January 28, 2002, sent a letter to the Townes with an attached "renewal agreement" whose terms allegedly contradicted Mr. Robbins' earlier assurances. The attached renewal agreement allegedly included a "unilateral release" through which the Townes would release any and all existing legal claims they may have against Robbins and his companies. The Townes declined to agree to the proffered terms. On August 30, 2002, Hunsaker

again approached the Townes about signing a renewal agreement. Because the Townes would not agree to the proffered terms, it appears the parties' relationship finally ended.

About a year and a half later, on December 13, 2002, the Townes brought this lawsuit. On September 4, 2003, they filed their third amended complaint, all 102 pages of it. Alleging they were the victims of a slick-talking "quack," the plaintiffs alleged the following claims in their complaint: breach of special relationship under state law, federal RICO violations, statutory claim under Oregon's state law RICO equivalent, common law fraud, violations of the Oregon Franchise Act, conspiracy, and request for declaratory relief. In support of their claims, the Townes have filed three expert affidavits which generally conclude that Mr. Robbins was a con artist skilled in the art of peddling seminars and books based on "quackery."

While much of the Townes' case depends on events occurring in the '90s, plaintiffs suggest they did not discover how they were being harmed during that period because Mr. Robbins "hypnotized" them and otherwise put them in an altered state. As examples of the extent of their lack of consciousness, the Townes state they were compelled to walk on fire-hot coals on two occasions in 1991 and participate in something called the "Whoa clap." They also allege they were victims of other "mind control" techniques including anchoring, preframing, and the power of suggestion. One of plaintiffs' experts, a Dr. Pankartz, opined that the Townes incorporated Mr. Robbins' belief system in their everyday lives:

---

**2.** The record shows Mr. Towne, to market his personal-consulting services, used materials almost identical to those he used in his capacity as a ARA franchisee. As a result of that fact, defendants have moved the court to amend their answer to state counterclaims against the Townes. That motion is not discussed in this order.

It is my opinion that Mr. and Mrs. Towne relied on Mr. Robbins as an expert in psychology matters that involved all aspects of their lives. Accepting the belief system of Mr. Robbins was an integral part of it[s] success[ ]. However, once a strong belief system is established, contradictory information is not easily received as truthful or relevant.

They also emphasize that Mr. Robbins consistently told them they had to stick with his methodologies for at least ten years in order to achieve all their life dreams and goals. At a 1990 conference, for example, Mr. Robbins told the Townes and other distributors: "only a few number of you, ten years from now [will still be Robbins distributors] . . . a few of you who are my best friends. . . . I'm here for the few who do, not the many who talk."

Not until August 2002, according to the Townes, did they fully realize they had been manipulated and ripped off. It is not entirely clear why August 30, 2002, is the day the Townes apparently had an epiphany regarding the true nature of Robbins' business tactics, although it appears that is the date when their expert witnesses' reports became available. Given the long passage of time since the parties' first agreement was signed, it is not surprising that statute-of-limitations issues are the subject of defendants' motion for partial summary judgment.

## II. ANALYSIS

Defendants contend that plaintiffs' federal RICO, ORICO, Oregon Franchise Act, special relationship, and fraud claims are barred as a matter of law in light of the applicable statutes of limitations. As an initial point, the plaintiffs concede that dismissal is appropriate for two of their claims, specifically, their ORICO and Oregon Franchise Act claims.[3] The court, therefore, will not consider those two claims. The court discusses the issue of limitations as it relates to plaintiffs' remaining claims, i.e., his federal RICO and common law special-relationship and fraud claims. In doing so, the two primary issues as to each claim can be characterized as follows: whether the claim accrued at a time beyond the applicable limitations period; and if so, whether the limitations period was nevertheless tolled in such a way as to make the claim timely. See *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir.2001) (noting that whether limitations period was tolled and when the period began to run are two issues which "are analytically distinct").

### A. Nature of Parties' Relationship

As an initial matter, the court briefly discusses the issue of whether the parties were part of a fiduciary relationship.[4] The Townes emphasize that the limitations is-

3. In the court's prior order, plaintiffs were given an opportunity to argue the existence of an Oregon Franchise Act claim based on the July 2001 negotiations regarding the possible renewal of the franchise agreement. In light of plaintiffs' stipulation, the court grants summary judgment against any claim based on that Act, as well as against the ORICO claim.

4. In analyzing the state-law issues presented by this dispute, the parties disagree about whether California or Oregon law applies. The Townes cite the franchise agreement's choice-of-law clause which designates California law. But, as defendants point out, the Townes have brought claims under Oregon statutes—the ORICO statute and Oregon Franchise Act. It is, therefore, somewhat confusing for the Townes to argue California law applies when they have expressly invoked Oregon law for claims based on the same underlying allegations. Nevertheless, the court need not engage in a conflict-of-law analysis, because both states' law on the issues presented is materially the same. Because applying one or the other has no bearing on the result, the court will, as the parties have done, cite to cases decided under both California and Oregon law.

sues must be viewed in light of the allegation that Mr. Robbins assumed a fiduciary relationship with his franchisees.

■ As a usual rule, the franchisor-franchisee relationship is not fiduciary in nature. See, *e.g., Boat & Motor Mart v. Sea Ray Boats, Inc.,* 825 F.2d 1285, 1292 (9th Cir.1987) (applying Calif. law); *Norwood v. Atlantic Richfield Co.,* 814 F.Supp. 1459, 1467–68 (D.Or.1991). But this is not an absolute rule. A franchisor may qualify as a fiduciary in relation to its franchisees under certain circumstances, particularly where the franchisee shows an "exceptional degree of reliance" on the franchisor. *Norwood,* 814 F.Supp. at 1467. In determining whether a franchise or distributorship relationship departs from the usual contours of a business relationship in such a way as to implicate fiduciary duties, courts generally focus on the degree of trust or confidence the franchisee reposes in the franchisor. See, *e.g., id.; Rickel v. Schwinn Bicycle Co.,* 144 Cal.App.3d 648, 654, 192 Cal.Rptr. 732 (1983). Important factors in evaluating the degree of trust or confidence upon which the relationship is built include the extent to which the franchisor controls the franchisee's business, the parties' respective bargaining power, whether the franchisor and franchisee have mutual or shared intentions, and how long the parties have been in the relationship. See, *e.g., Walker v. U–Haul Co. of Miss.,* 734 F.2d 1068, 1076 (5th Cir.1984) (applying Miss. law). The Oregon Court of Appeals, for instance, has held it was for a jury to decide whether a manufacturer and distributor had a fiduciary-type relationship. See *Eulrich v. Snap–On Tools Corp.,* 121 Or.App. 25, 36–37, 853 P.2d 1350 (1993), *vacated on other grounds by* 512 U.S. 1231, 114 S.Ct. 2731, 129 L.Ed.2d 854 (1994). In reaching that conclusion, the court emphasized that a manufacturer-distributor relationship generally does not

give rise to fiduciary duties, but nevertheless found a fact issue whether such duties existed under the circumstances presented: where, *inter alia,* the manufacturer promised to "take care of" its distributors, controlled the size and location of plaintiff's territory, and otherwise had control over many other aspects of how the plaintiff's distributorship was run. *Id.*

■ In the case at bar, taking a liberal view of the Townes' characterization of the evidence, the court finds the franchise relationship at issue sufficiently unique as to create fact issues regarding the existence of a fiduciary relationship. The evidence, read in favor of the non-movant plaintiffs, shows that the franchisor, RRI, and Mr. Robbins controlled central facets of the Townes' franchise including issues involving the Townes' sales territory. The Townes were expected to follow the specific procedures and programs created by Robbins. These facts, standing alone, likely would not give rise to fiduciary duties. But here, the record also suggests Mr. Robbins expected the Townes to adopt, in both their professional and personal lives, what they call Robbins' "belief system." For instance, the Townes emphasize they participated in "motivational" sessions in which Mr. Robbins hypnotized them and used other techniques in an effort to gain their trust. In short, the relationship suggested by the current record was one in which the Townes were asked to and did repose a significant degree of trust and confidence in Mr. Robbins who held himself out as someone "look[ing] after the [Townes'] interests as a fiduciary would." *Eulrich,* 121 Or.App. at 37, 853 P.2d 1350. But even though the court finds sufficient evidence to allow a jury to decide whether a fiduciary relationship existed, that conclusion does not change the court's ultimate conclusion—that the claims at issue

are largely time barred—as discussed below.

## B. Federal RICO Claim

■ The parties agree that the limitations period applicable to federal RICO actions is four years. See *Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The Ninth Circuit follows the "injury discovery" rule in deciding whether civil RICO claims are time barred. *Pincay*, 238 F.3d at 1109–10. Pursuant to that rule, " 'the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies his cause of action.' " *Id.* (quoting *Grimmett v. Brown*, 75 F.3d 506, 510–11 (9th Cir.1996)). Thus the focus is on the injury at issue, and whether the plaintiff actually knew or a reasonable person would have known of the injury.

In this case, the court finds that, as a matter of law, a reasonable person would have known about the alleged injury over four years before the Townes filed this lawsuit in December 2002. The Townes' alleged injury, generally speaking, is purely financial—their franchise's failure to generate as much income as they had expected. Robbins and his companies have been fined by the FTC for alleged fraudulent practices and sued on numerous occasions by former distributors and franchisees for alleged fraud. In addition, for the first few years, from 1991 through 1996, the Townes' income reached a maximum of about $19,000, far below what was expected when they left their prior jobs to join the Robbins' team. Indeed based on the 1997 letter written by the Townes, it is clear they were *actually* aware of their financial injury. In that letter, they complained that the franchise had struggled from the start and seen many more "bad months" than good. In short, the record

conclusively establishes that, under the injury-discovery rule, the limitations period commenced no later than 1997, over four years before the Townes filed this lawsuit.

■ This result is not changed by the existence of any fiduciary relationship between the Townes and defendants. The Ninth Circuit has expressly decided the issue of whether the injury-discovery rule is altered by the existence of a fiduciary relationship. See *Pincay*, 238 F.3d at 1109. The court rejected the proffered fiduciary-based limitation on the injury-discovery rule, holding "that constructive notice begins to run the statute of limitations regardless of any fiduciary relationship between the injured and the injurer." *Id.*

The court, therefore, grants summary judgment against the Townes' federal RICO claim, insofar as that claim is based on events occurring before December 13, 1998. Whether any RICO claim can be based on events occurring after that date will be the subject of future briefing. The next issue is whether the Townes' state law claims also are subject to defendants' statute-of-limitations defense.

## C. Fraud and Special–Relationship Claims

■ The court also finds that, as a matter of law, the statute of limitations has run as to the bulk of the allegations underlying plaintiff's fraud and special-relationship claims. The parties agree that a discovery rule governs the commencement of limitations as to these claims. The parties also agree that under Oregon law the applicable limitations period is two years, and under California law the applicable limitations period is three years. Because the claims are barred whether a two- or three-year period is applied, the court need not determinatively decide which applies.

Under state law discovery rules, the limitations period "begins to run when the plaintiff knows or in the exercise of reasonable care should have known [of] facts which would make a reasonable person aware of a substantial possibility that each of the three elements (harm, causation, and tortious conduct) exists." *Gaston v. Parsons*, 318 Or. 247, 255–56, 864 P.2d 1319 (1994); see also *Mark K. v. Roman Catholic Archbishop of Los Angeles*, 67 Cal.App.4th 603, 610, 79 Cal.Rptr.2d 73 (1998) ("Under the discovery rule, the statute of limitations begins to run when the plaintiff suspects or should suspect that [his] injury was caused by wrongdoing. . . . [T]he limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry . . . . (citations omitted)"). Thus the test is disjunctive: limitations begins to run when *either* the plaintiff has actual knowledge of the facts underlying his or her claim *or* a reasonable person would have been put on notice of the existence of such facts. Importantly, commencement of limitations "does not depend on plaintiff's having actual or inquiry knowledge of 'all of the particulars of his or her ultimate injury.' " *Starr v. Dow Agrosciences, LLC*, No. 03–830, 339 F.Supp.2d 1097, 1104, 2004 WL 1824119, at *6 (D.Or.2004) (quoting *Widing v. Schwabe, Williamson, & Wyatt*, 154 Or.App. 276, 283, 961 P.2d 889 (1998)). "Rather, the rule delays the running of the limitations period only until the plaintiff knows or should know that *some* harm has been incurred and that *a* claim exists." *Widing*, 154 Or.App. at 283, 961 P.2d 889 (emphasis in original). Thus a "plaintiff need not be aware of the specific 'facts' necessary to establish the claim; that is a process contemplated by pretrial discovery." *Mark K.*, 67 Cal.App.4th at 610, 79 Cal.Rptr.2d 73; see also *Duyck v. Tualatin Vall. Irrigation Dist.*, 304 Or. 151, 163–64, 742 P.2d 1176 (1987) ("Nor is the statute suspended for purposes of allowing a plaintiff to develop facts to support or identify a theory of recovery or, as stated by the Court of Appeals, to learn all the facts which they might ultimately be able to advance to support their claim." (citation omitted)).

While the articulation of the state law discovery rule is similar to the injury-discovery rule applied in federal RICO cases, the state standard is, at least potentially, more favorable to plaintiffs. As mentioned, the injury-discovery rule focuses on notice of the injury only. In contrast, the applicable discovery rule under state law also contemplates having notice of, not just the injury, but also the cause of the injury. See, e.g., *Gaston*, 318 Or. at 255–56, 864 P.2d 1319 (explaining limitations begins to run when there is notice of the "elements" of tort claim). In any event, the difference is immaterial in this case.

As discussed, the Townes undisputedly knew about their alleged financial injury, year after year, during the early and mid '90s. In 1997, the Townes expressed concern about their then-continuing financial struggles. And, significantly, they also expressly acknowledged the fact that Robbins' business model had "put over 70 business owners out of business." As Mr. Towne further explained: "Many of the franchises ha[d] sued the franchisor for its lack of support and follow through on its promises. The franchisor ha[d] settled in most cases." In addition, by about July of 1999, both Mr. and Mrs. Towne had given up on working for their franchise on a full-time basis. Mr. Towne, in fact, accepted a full-time position with another company. At his deposition, he explained he accepted the new job because the franchise was not meeting their expectations financially. Given these facts (which represent but a sample of facts in the record showing ei-

ther actual or constructive notice), a strict application of the discovery rule prevents the Townes from basing their claims on the alleged misrepresentations which occurred in the '90s.

■ In an attempt to sidestep the ineluctable conclusion they actually knew or, at least, a reasonable person would have been put on notice of the existence of the claims at issue, the Townes suggest that limitations did not begin to run at all during the existence of the parties' franchise relationship, because that relationship was fiduciary in nature. The court finds no persuasive support for applying the Townes' proffered rule, under which limitations absolutely would not run as long as the fiduciary relationship at issue was ongoing.[5] Indeed, a central justification for adopting a discovery rule is the recognition that certain relationships, especially those of a fiduciary nature, justify delaying accrual of limitations until the plaintiff knew

or should have known of the claim. See, e.g., *Mark K.,* 67 Cal.App.4th at 611, 79 Cal.Rptr.2d 73 ("[C]ourts have relied on the nature of the relationship between defendant and plaintiff to explain application of the delayed accrual rule. The rule is generally applicable to *confidential or fiduciary relationships.*" (emphasis added)). Thus the discovery rule already accounts for the possible existence of fiduciary relationships. To adopt the rule proffered by the Townes would strike an entirely new compromise for which there is not persuasive support.[6]

In many cases, the nature of the fiduciary relationship undoubtedly will inform the fact-intensive issue of whether a reasonable person under the same circumstances would have been put on notice of the existence of a potential claim. For instance, the nature of the attorney-client relationship might relax a client's underlying obli-

---

**5.** The Townes do cite one case to support that idea. See *Kasey v. Molybdenum Corp.,* 336 F.2d 560 (9th Cir.1964) (applying Calif. law). *Kasey* made the following statement, upon which the Townes rely: "a statute of limitations does not begin to run where there is a fiduciary relationship between the parties until the relationship is repudiated." *Id.* (citing Cal. Jur.2d, *Limitation of Actions* ). The court does not find this statement to be persuasive authority insofar as the Townes assert that limitations never runs against a fiduciary until the relationship has been repudiated. First, Cal. Jur., which *Kasey* cited, makes clear that the "repudiation" idea applies in the context of "trusts." See Cal. Jur.2d, *Limitation of Actions* § 18; see, e.g., *Manchester Band of Pomo Indians v. United States,* 363 F.Supp. 1238, 1249 (N.D.Cal.1973) (citing *Kasey* and observing, "the statute does not run against a beneficiary in favor of a trustee until the trust is repudiated and the fiduciary relationship terminated"). Moreover, the court in *Kasey* seemed to assume that there was an "express trust" at issue in that case. In addition, because repudiation had occurred there, the Ninth Circuit did not need to decide whether "repudiation" actually was a valid

rule for measuring the commencement of limitations. See *Kasey,* 336 F.2d at 570. In sum, without more persuasive authority, this court is unwilling to endorse a rule which would delay accrual indefinitely any time a fiduciary relationship existed, thereby potentially rendering the much more established discovery rule effectively meaningless in cases involving fiduciary duties.

**6.** The Townes' proffered approach of delaying commencement of limitations until an endpoint in the fiduciary relationship may be applicable in certain contexts. For instance, some courts have held that limitations for a legal-malpractice claim against litigation counsel cannot begin to run until the litigation in which the alleged malpractice occurred is over; the policy reason for that rule is that clients otherwise would be forced to find new counsel and take positions in the malpractice case inconsistent with the positions taken in the underlying litigation. See, e.g., *Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 119–21 (Tex.2001). The Townes present absolutely no policy reason for indefinitely delaying accrual of limitations during the existence of a franchise relationship.

gation to make reasonable inquiry. In contrast, other relationships, although presenting fiduciary duties, are qualitatively different and will not justify forgiving a plaintiff's material lack of diligence in investigating a possible claim. See, e.g., *Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal.4th 1142, 1150–51, 113 Cal.Rptr.2d 70, 33 P.3d 487 (2001) ("The insurer-insured relationship [although a limited fiduciary relationship] is not a true 'fiduciary relationship' in the same sense as the relationship between trustee and beneficiary, or attorney and client.").

In this case, even though there are fact issues regarding whether a fiduciary relationship existed, the undisputed fact remains that the relationship was one between a franchisor and franchisee and thus not one traditionally implicating fiduciary duties. In any event, even assuming in this case a relaxed duty to investigate any possible claims, the particular facts presented here do not forgive the Townes' failure to sue until 2002. As mentioned, the Townes expressly acknowledged their repeated financial disappointments and the numerous lawsuits filed against Robbins. Indeed the fact numerous distributors and franchisees—who also presumably were exposed to Mr. Robbins' alleged "mind control" techniques—actually sued Mr. Robbins cuts sharply against the idea there is no reason to believe the Townes should have known about the existence of possible claims against defendants.

■ For similar reasons, the court rejects the Townes' suggestion that the equitable-tolling doctrine of "fraudulent concealment" applies to this case. Fraudulent concealment applies when the plaintiff "establishes affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Pincay*, 238 F.3d at 1110 (citation omitted). The limitations period remains tolled pursuant to that doctrine only until "the plaintiff knew or should have known that she had a cause of action despite" the fraudulent representations or conduct. *Duncan v. Augter*, 62 Or.App. 250, 258, 661 P.2d 83 (1983); see also *Pincay*, 238 F.3d at 1110 (noting "long line of cases" holding that fraudulent-concealment doctrine does not apply if plaintiffs had either "actual or constructive notice of the facts constituting their claim for relief"); *Rita M. v. Roman Catholic Archbishop of Los Angeles*, 187 Cal.App.3d 1453, 1460, 232 Cal.Rptr. 685 (1986) (" 'The doctrine of fraudulent concealment ... does not come into play, whatever the lengths to which a defendant has gone to conceal the wrongs, if a plaintiff is on notice of a potential claim.' ") (quoting *Hobson v. Wilson*, 737 F.2d 1, 35 (D.C.Cir. 1984)). There simply is no "concealment" where the plaintiff knew or should have known about the facts allegedly underlying the claims at issue. Thus fraudulent concealment does not apply here. As discussed, the Townes actually knew—or at least should have known—of the existence of possible claims against the defendants long before this lawsuit was filed.

■ The Townes seem to suggest that tolling principles apply, in any event, as a result of Mr. Robbins' psychological manipulation of them. In an effort to describe the extent of such alleged mental manipulation, the Townes emphasize they were the victims of hypnosis and other mind-control techniques. As part of this effort, the Townes filed affidavits by three alleged experts.

Both Oregon and California law recognize that a mental disability may toll the running of a limitations period. See ORS 12.160; Cal.Code Civ. Proc. § 352(a). The standard, however, is very high, requiring a showing of "insanity." See, e.g., *Gaspar*

*v. Village Missions,* 154 Or.App. 286, 289–90, 961 P.2d 286 (1998) (citations omitted). At oral argument, the Townes' counsel conceded his clients were not insane.

Nevertheless, the Townes suggest that the peculiar "mind control" which occurred here justifies tolling limitations. The court refuses to create any such tolling doctrine. First, both the Oregon and California legislatures have already spoken on when potential litigants' mental state tolls limitations, setting insanity as the standard. Second, while the Townes' expert affidavits arguably go far in establishing that Mr. Robbins practices "quackery" and seeks to manipulate, in cult-like fashion, his franchisees and employees, the affidavits do not show the Townes were incapable of understanding they were being financially harmed. Third, and most important, tying the commencement of limitations to how certain mind-control techniques affected a particular litigant would introduce new and extensive uncertainty into the law of limitations. As explained by another court, in the course of rejecting a plaintiff's argument that her devotion to defendants' "transcendental meditation" had caused her to suffer from a mental impairment which, in turn, prevented limitations from running:

> [W]e do not believe that [plaintiff's] allegations that she was subjected to "social pressure" and "philosophical indoctrination" by the defendants, and that she felt economically, socially, and psychologically dependent on them, are sufficient to toll the running of the statute of limitations. Were we to adopt [plaintiff's] position, the "bright line" certainty which statutes of repose are designed to achieve would be substantially and irreparably impaired. In the absence of any meaningful limiting principle, [plaintiff's] approach would permit any plaintiff who sues an apparently more powerful defendant—*e.g.,* an employee alleging job discrimination, or a prisoner complaining of conditions of incarceration—to claim that his fear of and dependency upon the adversary is the result of an inhibiting atmosphere created by the defendant, and that the statute of limitations should be tolled until the plaintiff was free of any pressure or dependency. Such a doctrine would, in our view, severely undermine the protections afforded by the statute of limitations.

*Hendel v. World Plan Exec. Council,* 705 A.2d 656, 666–67 (D.C.1997). In sum, the court declines to adopt a new tolling principle which would be so broad as to protect intelligent adults, like the Townes, who had every reason to believe, and in fact did believe, they had been harmed.

■ The court finally rejects the Townes' suggestion that equitable estoppel applies here. Pursuant to the equitable-estoppel doctrine, limitations is tolled when the defendant "lulled the plaintiff, by affirmative inducement, into delaying the filing of a cause of action." *Philpott v. A.H. Robins Co.,* 710 F.2d 1422, 1425 (9th Cir.1983) (applying Oregon law). The difference between estoppel and fraudulent concealment, as generally articulated, is this: fraudulent concealment applies when the plaintiff lacks actual or constructive notice of his or her claim, "while equitable estoppel applies when a plaintiff who knows of his cause of action reasonably relies on the defendant's statements or conduct in failing to bring suit." *Stitt v. Williams,* 919 F.2d 516, 522 (9th Cir.1990). The application of estoppel in the limitations context is generally tied closely to the specific decision of whether actually to file a lawsuit. For instance, where an insurance company allegedly promised the insured the company would fully settle the claim for benefits and did in fact make partial settlement payments, thus inducing the insured not to sue, estoppel will be

applied to toll limitations. See *Lyden v. Goldberg*, 260 Or. 301, 306, 490 P.2d 181 (1971).

There is nothing similar in the case at bar; the record contains no evidence that any defendant made a statement promising to settle or otherwise aimed specifically at persuading plaintiff not to pursue legal action. The defendants at best made general statements attempting to alleviate the Townes' concerns about their earnings and which contradicted other information suggesting the Townes had a basis for suing defendants. Under some circumstances, it may be that a plaintiff should be able to rely on statements made by a fiduciary, even though the statements contradict other available information, without having actively to investigate the possible existence of a claim. This undoubtedly is not such a case, however. The bulk of the statements cited by the Townes all occurred in the early or mid '90s.[7] After these alleged statements were made, the Townes were subsequently exposed to additional information further clarifying that the facts underlying their fundamental concerns had not changed. As mentioned previously, the Townes, in a 1997 letter, stated their franchise had seen many bad months and the franchisor had failed to follow through on promises, thus causing several individuals to sue the franchisor. And by 1999, Mr. Towne entirely gave up hope for his franchise, taking another full-time position. Thus, on this record, it would strain credulity to find that the alleged fraudulent statements made it reasonable for the Townes to delay pursuing legal action until December 2002. The law simply does not permit potential litigants to trust blindly a party's manifestly hollow promises, even if made by a fiduciary. The Townes' blanket approach of tolling limitations as long as an alleged con-man offered explanations at some point would effectively exempt most fraud cases from statutes of limitations, since any good con-man knows how to explain away suspicious facts. In light of the particular facts presented, the court rejects the application of any estoppel doctrine.

In summary, the Townes had actual knowledge of their injury and, at the very least, were put on constructive notice of what they now claim was the cause of that injury: Mr. Robbins' and his associates' misrepresentations made throughout the '90s. No tolling or estoppel doctrine applies here. Thus state law compels the conclusion that the Townes' claims are almost entirely time barred.

 The Townes' claims do not appear to be entirely time barred, because they also allege misrepresentations which occurred in connection with their 2001 decision to continue operating the franchise. To the extent their claims are based on such misrepresentations, the Townes' state law claims were timely filed. But, as discussed, the Townes' claims are otherwise time barred, given that the other alleged misrepresentations occurred at least three years before the Townes filed this lawsuit.

### D. Attorney Fees

Defendants argue they should recover attorney fees in connection with having to defend against what they call this "merit-

---

**7.** Specifically, the Townes primarily rely on the following: representations made in pre-1990 issues of the *Robbins Research Report;* the explanation in the early '90s that the lawsuits brought against Robbins by distributors and franchisees involved businesses which failed solely because of the plaintiffs themselves; statements made in connection with the 1991 UFOC; a 1992 memorandum by Mr. Hunsaker defending against allegations made in lawsuits brought against Robbins and his companies; and a 1995 memorandum by Mr. Hunsaker defending against the settlement with the FTC.

less" lawsuit. Defendants point out that both the Oregon Franchise Act and ORICO allow a court to award attorney fees to the prevailing party. See ORS650.020(3); ORS 166.725.

The Townes do not brief the merits of the propriety of awarding attorney fees pursuant to these statutes, presumably because they believed voluntarily dropping these claims would preclude an award of attorney fees. Because the Townes pursued these statutory claims up to this point, just now abandoning them, the court will consider an award of attorney fees. The court, however, will not decide the issue of attorney fees until the conclusion of this lawsuit—at which time the Townes will get a chance to discuss the proper standard for determining whether attorney fees are appropriate under those statutes and whether fees should be awarded in this case. Accordingly, the court does not at this time decide whether an award of attorney fees is appropriate.

## III. CONCLUSION

The court finds that the record conclusively establishes that plaintiffs' special-relationship and fraud claims are time barred, insofar as those claims are based on alleged misrepresentations occurring before December 13, 1999.[8] In addition, the federal RICO claim is barred to the extent that claim is based on events occurring four years before this lawsuit was filed. However, plaintiffs also seem to base their claims on misrepresentations made in connection with the 2001 decision to continue the franchise. To the extent the claims are based on such misrepresentations, plaintiffs' claims are not time barred. The court will depend on the

parties' future briefing to inform the court about the status and viability of any remaining claims.

Thus, for the reasons discussed in this order, defendants' motion for partial summary judgment re: limitations is GRANTED in part and DENIED in part. (Doc. # 154). The parties should inform the court what discovery issues, if any, remain pending in light of the court's statute-of-limitations rulings. The court DENIES as MOOT defendants' motion to strike. (Doc. # 225). The court takes under advisement defendants' motion to amend answer to state counterclaims (doc. # 147), as well as the pending discovery motions (docs. # 150, 160, and 194).

IT IS SO ORDERED.

---

8. As mentioned, Oregon law sets forth a two-year limitations period, while California sets forth a three-year period. But, because the plaintiffs do not allege misrepresentations which occurred in the interval between the two periods, there is no reason, at least at this point, to decide whether Oregon or California law applies.